[No. D032423. Fourth Dist., Div. One. Mar. 31, 2000.]

DAVID IRVING HATCH, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

172

**COUNSEL**

Robert E. Boyce and Laura G. Schaefer for Petitioner.

No appearance for Respondent.

John T. Philipsborn for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Petitioner.

Cynthia M. Sorman, Diane Nichols and Neil F. Auwarter for Appellate Defenders, Inc., as Amicus Curiae on behalf of Petitioner.

Paul J. Pfingst, District Attorney, Patricia K. Atwill, Thomas F. McArdle and James E. Atkins, Deputy District Attorneys, for Real Party in Interest.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Carl H. Horst and Arlene Aquintey Sevidal, Deputy Attorneys General, for the State of California as Amicus Curiae on behalf of Real Party in Interest.

**OPINION**

**BENKE, Acting P. J.**—Petitioner David Irving Hatch challenges his being held to answer on many charges of transmitting harmful matter over the Internet to a child in an attempt to seduce the child. Hatch argues, among other points, that a decision of the United States Supreme Court, *Reno v. American Civil Liberties Union* (1997) 521 U.S. 844 [117 S.Ct. 2329, 138 L.Ed.2d 874] (*Reno*), requires we order the bulk of the charges dismissed on constitutional grounds. We do not agree.

## INTRODUCTION

A decade ago, in response to concerns over the use of obscene or indecent matter in the seduction of children, the California Legislature enacted Penal Code[1] section 288.2, subdivision (a). This statute, which has been construed by no reported decision, made it a criminal offense to send, *by any means*, specified harmful matter to a minor "with the intent or for the purpose of seducing a minor." (*Ibid.*)

In the years after 1990, use of the Internet[2] as a means of communication expanded rapidly, as it continues to do.[3] In 1996, the United States Congress, in legislation known as the Communications Decency Act of 1996 (CDA), made it an offense to send or display indecent matter to minors over the Internet, but those enactments were declared unconstitutional by the *Reno* decision of the United States Supreme Court in 1997.

---

[1] All statutory references are to this code unless otherwise stated.

[2] The Internet, its operation and the topics of sexually explicit material and age verification are well summarized in *Reno, supra,* 521 U.S. at pages 849-867 [117 S.Ct. at pages 2334-2342]. We adopt that summary for purposes of the discussion herein.

[3] "The record demonstrates that the growth of the Internet has been and continues to be phenomenal." (*Reno, supra,* 521 U.S. at p. 885 [117 S.Ct. at p. 2351].) The *Reno* court estimated Internet use would expand fivefold between 1996 and 1999. (*Id.* at p. 850 [117 S.Ct. at p. 2334].)

Later on in 1997, with California concern now focused specifically on use of the Internet to seduce minors, and with the then recent United States Supreme Court CDA decision in mind, the California Legislature enacted a more specific version of the 1990 statute, section 288.2, subdivision (b), now proscribing sending defined harmful matter *over the Internet* to a minor for purposes of seduction. This statute did not become effective until January 1, 1998.

Because of the timing of the offenses committed in this case, Hatch was charged with numerous violations of the 1990 statute, alleged to have been committed prior to the effective date of the 1997 statute, and also with two violations of the latter statute, as well as other offenses. Hatch argues several evidentiary issues and also challenges the statutes both under principles of statutory construction and, relying heavily on the Supreme Court decision overturning the CDA, on various constitutional grounds.

We thus must resolve Hatch's various evidentiary arguments, construe the language of both the 1990 and 1997 statutes and determine also whether the statutes withstand Hatch's commerce clause and First Amendment challenges to their provisions. We first set out the procedural and factual background, review the pertinent state and federal statutes we will discuss and then proceed to determine the various evidentiary, statutory construction and constitutional questions presented by Hatch.

Factual Background

The present charges arise from a type of "sting" operation conducted by a private entity. They involve not only Hatch's Internet communications with two imaginary victims, but also his meeting with an intended victim and the results of a search of Hatch's home and his computer.

A. *Beginning of the Affair*

In the summer of 1997, INN News (Fox Television) advertised for intelligent, fast-thinking women who appeared young, but who were over 18 years of age. Jennifer Hersey, a 20-year-old woman who appeared quite youthful, was hired. Her duties were to pose as a 13-year-old girl and to talk on the Internet with persons seeking sexual encounters with underage women. Hersey referred to such persons as "people that were basically stalking children on the Internet." Hersey posed as two different girls, "Stacie" and "Lisa," and posted on the Internet biographical information, stating that each of them was 13 years old. Hersey then waited to be contacted by men.

Her first contact with Hatch occurred on September 6, 1997. Hersey, posing as Stacie, was in an Internet chat room in which persons talk with one another in a "virtual room." Hatch, using the screen name "Jordan9787," sent Stacie a private message asking if she liked older guys. On September 8, 1997, Hatch and Stacie exchanged Internet communications in which Stacie stated she was 13 years old. These initial contacts were followed by a series of Internet communications between Hatch and Stacie and between Hatch and Lisa. Hersey made copies of her Internet communications with Hatch, wrote the dates of the communications on the copies and delivered the copies to police.

B. *The Stacie Internet Counts, Counts 2-13 and 20*

The factual bases for what were eventually alleged in an information as counts 2 through 13, attempted seduction of a minor by any means (§§ 664, 288.2, subd. (a)) consist of Internet communications summarized as follows:

Count 2: On September 9, 1997, Hatch and Stacie exchanged communications discussing in detail the sexual conduct in which they could engage when they met. Hatch expressed his concerns about being caught.

Count 3: On September 10, 1997, Hatch sent Stacie messages asking her to meet him in person. He also sent her a picture of two females engaged in sexual conduct with a man and Hatch stated "heres a pic of something we can try." This action was also the basis for count 20, possession of pictures of a minor engaging in sexual conduct. (§ 311.1.)

Count 4: On September 11, 1997, Hatch and Stacie exchanged messages in which Hatch suggested sexual conduct. He also sent Stacie a picture of a young girl masturbating and stated he could show her many more pictures when they met.

Count 5: On September 12, 1997, Hatch suggested to Stacie sexual conduct in which they could engage when they met. He pressured Stacie to meet with him, although he expressed his fear Stacie might be a trap. He also sent Stacie pictures of a young girl with a man, a young girl having sexual relations with a man and a nude girl. He reiterated he could show her many more pictures when they met.[4]

Count 6: On September 13, 1997, Hatch sent Stacie a photograph of a nude girl.

Count 7: On September 19, 1997, Hatch suggested to Stacie several types of sexual conduct in which they could engage when they met. He asked her

---

[4]About this time, Hatch began his Internet communications with Lisa.

if he could take pictures while they had sex and promised not to show them to anyone because it would be imprudent to show pictures of a 13-year-old having sexual relations with him.

Count 8: On September 22, 1997, Hatch sent Stacie a picture of a nude young girl and tried to arrange to meet her at a motel so they could have sexual relations. He expressed his fear he would lose his job if Stacie reported him and obtained Stacie's assurances she was not with the police.[5]

Count 9: On October 23, 1997, Hatch expressed to Stacie his continued desire that she have sexual relations with him. He asked her to send a nude picture of herself to him, and she asked him to send her a nude picture of himself.

Count 10: On September 27, 1997, Hatch sent Stacie a picture of himself nude and asked her to telephone him if she could meet with him or if she wanted to hear him ejaculate. In an angry conversation, he accused Stacie of manipulating him to obtain the pictures and told her to go away.

Count 11: On October 28, 1997, Hatch accused Stacie of cowardice because she refused to meet him. Hatch asked her to send a picture of herself nude and offered to show her pictures of himself nude when they met. He told her he had met Lisa, another 13-year-old, and they planned to meet that Wednesday night. He represented that the first of either Stacie or Lisa to meet with him would become his only girlfriend.

Count 12: On November 25, 1997, Hatch tried to convince Stacie to meet with him. She asked him for more pictures and he became upset and told her she could see all of his pictures.

Count 13: On February 8, 1998, Hatch and Stacie had their last communication. Stacie asked him for more pictures, and they discussed meeting and engaging in sexual conduct. Hatch sent Stacie pictures of nude girls and of a girl and a man having intercourse.

C. *The Lisa Internet Counts, Counts 14-19*

The factual bases for counts 14 through 19, attempted seduction of a minor by any means (§§ 664, 288.2, subd. (a)) consist of Internet communications summarized as follows:

---

[5]The following day, Stacie communicated with Hatch, stating she wanted to find someone her own age and was not interested in pursuing their relationship further. However, Stacie was subsequently contacted by Hatch, and the subsequent contacts formed the basis of the remaining counts involving Stacie.

Count 14: On September 15, 1997, Hatch and Lisa had a conversation in which Hatch suggested they could meet and engage in sexual conduct.

Count 15: On September 18, 1997, Hatch told Lisa that if they met, she could see him nude. He asked permission to come to her house "right now" to display himself in the nude or to give her a picture of himself nude.

Count 16: On September 21, 1997, Hatch suggested to Lisa they could meet and engage in sexual conduct. Hatch arranged to meet her at a restaurant that evening. They met that night at the appointed place. During the meeting, Hersey, posing as Lisa, asked Hatch if he was going to display himself, and he replied that because of the way she looked at him, she could make him do anything she wanted. After their meeting, they had another conversation in which they discussed having sexual relations.

Count 17: On September 22, 1997, Hatch sent Lisa a picture of a nude young girl and asked Lisa if she resembled the girl in the picture. He also tried to arrange another meeting with her.

Count 18: On September 23, 1997, Hatch told Lisa that thinking of her aroused him. Hatch suggested several ways for them to safely meet.

Count 19: On February 1, 1998, Lisa suggested Hatch meet her at a hotel pool area and asked Hatch if he would expose himself. Hatch stated he could not expose himself in a public pool area. He also expressed reluctance to meet her because she would cause him to be aroused but the public nature of the pool would prevent him from obtaining satisfaction. They agreed to meet that afternoon at the hotel.

### D. *The Hotel Meeting, Counts 1, 22 and 23*

On February 1, 1998, Hersey, posing as Lisa, met Hatch at a hotel pool area. Hatch wanted a hug but Hersey only "halfway" hugged Hatch. After they sat down, Hatch showed her pictures of himself nude. They engaged in small talk during the next 20 minutes, and Hatch told her of his sexual plans. However, Hersey refused Hatch's invitation to accompany him in his truck. He threw a temper tantrum, stomped out of the pool area and walked to his truck. Hersey waited a few minutes and then followed him to his truck. Hatch tried to convince her to enter the truck but she refused. Hatch then unzipped his pants and began to masturbate. Hersey asked Hatch for permission to photograph him and he agreed. After he ejaculated onto his hand, he extended that hand toward Hersey. This encounter resulted in the charges of an attempted lewd act on a minor under the age of 14 years, count 1 (§§ 664,

288, subd. (a)); lewd conduct, count 22 (§ 647, subd. (a)) and indecent exposure, count 23 (§ 314, subd. 1).

### E. *The Search, Count 21*

Police later executed a search warrant at Hatch's home. Detective Armstrong, a computer- and child-pornography expert, examined the floppy discs and computer seized at Hatch's home. Armstrong retrieved the images stored on the floppy discs. He opined that three of the images on the floppy discs depicted child pornography based on the physical characteristics of the persons shown engaging in sexual acts.

Hatch's computer lacked the software necessary to view the photographs stored on the discs. However, the computer hard drive had ghost images of some of the photographs, which showed the images had at one time been present on the computer's hard drive before being loaded onto the floppy discs. Hatch was charged with possession of matter depicting minors engaged in sexual conduct, count 21. (§ 311.11, subd. (a).)

### PROCEDURAL BACKGROUND

The above counts were set out in an information filed April 23, 1997, by the District Attorney of San Diego County.[6] The preliminary hearing was held on August 25, 1998. Evidence was received from Hersey, the person who posed as a minor under age 14, and from police officers. The court also received videotape, transcripts and photographs in evidence. At the conclusion of the hearing, counsel for Hatch argued the insufficiency of the evidence and the inapplicability of section 288, subdivision (a), to Internet communications, but the magistrate rejected all of these arguments.

On October 16, 1998, Hatch filed a motion to set aside the information under section 995, raising again his challenges to the sufficiency of the evidence, the statutory applicability of section 288.2, subdivision (a), to his conduct and now adding challenges to the constitutionality of section 288.2, subdivision (b) and, insofar as it was applicable to Internet communications, section 288.2, subdivision (a).

After hearing argument on the motion, the superior court judge issued an order on November 18, 1998, denying Hatch's motion to dismiss. On

---

[6]The charging language in each of these counts mirrors the statutory language, alleging that Hatch either knew his victims were minors or acted "failing to exercise reasonable care to ascertain the true age of said minor." Because the evidence here supports an inference, and as we shall hold, Hatch in fact knew that his intended victims were under age 14, we treat the cited negligence language as surplusage. This alternative language was deleted in the process leading to section 288.2, subdivision (b).

December 2, 1998, Hatch petitioned this court for a writ of mandate, reiterating his challenges to various areas of evidentiary sufficiency, arguing points of statutory interpretation and again setting out both Hatch's commerce clause and First Amendment challenges.

On February 27, 1999, we issued an alternative writ and thereafter heard argument, following which we solicited further briefing on the statutory interpretation and constitutional issues from the parties and also from various amici curiae.

## DISCUSSION

Hatch argues the above evidence is insufficient in many respects: that section 288.2 is unconstitutional under the commerce clause and the First Amendment; and that section 288.2, subdivision (a), should be interpreted not to apply to the Internet.

### I

### Statutory Background

Three legislative enactments, California's section 288.2, subdivisions (a), and (b) and the federal CDA, require our attention at some length. We examine each in turn.

### A. Section 288.2, Subdivision (a)[7]

Section 288.2, subdivision (a), provides: "Every person who, with knowledge that a person is a minor, or who fails to exercise reasonable care in ascertaining the true age of a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by any means, including, but not limited to, live or recorded telephone messages, any harmful matter, as defined in Section 313, to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent or for the purpose of seducing a minor, is guilty of a public offense and shall be punished by imprisonment in the state prison or in a county jail.

---

[7]Initially enacted as Statutes 1989, chapter 1316, section 1, page 5285, the statute is codified as Penal Code section 288.2.

"A person convicted of a second and any subsequent conviction for a violation of this section is guilty of a felony."[8]

Section 313, in turn, provides in part: "(a) 'Harmful matter' means matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors."

### B. *Communications Decency Act (CDA)*

In 1996 Congress enacted the Telecommunications Act of 1996 (Pub.L. 104-104, 110 Stat. 56), which the *Reno* court described as "an unusually important legislative enactment. . . . [I]ts primary purpose was to reduce regulation and encourage 'the rapid deployment of new telecommunications technologies.' " (*Reno, supra*, 521 U.S. at p. 857 [117 S.Ct. at p. 2338].) While six of the Telecommunications Act's seven titles were products of extensive legislative hearings and Senate and House committee reports, key provisions of title V of the act, known as the Communications Decency Act of 1996 (CDA), arose from a Senate amendment. The CDA in two sections made criminal both the "indecent transmission"[9] and the "patently offensive display"[10] of material to minors on the Internet. (47 U.S.C. § 223(a); *id.*, § 223(d).)

### C. *Section 288.2, Subdivision (b)*

By Statutes 1997, chapter 590, section 1, the California Legislature added a new subdivision to section 288.2, as follows: "(b) Every person who, with knowledge that a person is a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by electronic mail, the Internet . . . or a commercial online service, any harmful matter, as defined

---

[8]Section 288.2, like the provisions of the CDA considered *post*, enumerates in subdivisions (c), (d) and (e) affirmative defenses to imposition of liability thereunder. While the *Reno* court addressed the issue of affirmative defenses (*Reno, supra*, 521 U.S. at pp. 881-882 [117 S.Ct. at pp. 2349-2350]), our resolution of the constitutional questions presented does not depend upon a consideration of these matters, and we thus do not further refer to them.

[9]Title 47 United States Code section 223(a) provides in pertinent part for a two-year prison term for one who transmits interstate or foreign telecommunications containing "any comment, request, suggestion, proposal, image, or other communication which is obscene or indecent, knowing that the recipient . . . is under 18 years of age."

[10]Title 47 United States Code section 223(d) provides in pertinent part for a two-year prison term for one using an interactive computer service to (a) send to a person under age 18 or (b) display in a manner available to persons under age 18 "any comment, request, suggestion, proposal, image, or other communication that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs."

in Section 313, to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent, or for the purpose of seducing a minor, is guilty of a public offense . . . ."

This statute became operative on January 1, 1998. As we earlier noted, the result in this case is that most of the counts alleged against Hatch arise under the 1990 legislation.

Hatch makes many challenges to the sufficiency of the evidence and also argues that the above statutes should be so construed as to be inapplicable to his conduct or that they are constitutionally infirm under the commerce clause and the First Amendment. We proceed to these questions.

## II

### *Sufficiency of the Evidence*

Hatch attacks the sufficiency of the evidence introduced at the preliminary hearing to support the attempted seduction of a minor charges set forth in counts 2 through 19, as well as the evidence supporting several of the other charges. Our review of such assertions, arising in the context of review of the denial of a section 995 motion to dismiss, is a highly deferential one.

### A. *Standard of Review*

We are not here reviewing the sufficiency of the evidence to support a jury finding of the truth of the charged offenses. Instead, we must determine only whether there is sufficient evidence in the preliminary hearing transcript to permit the district attorney to proceed to trial. (*People v. Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278].) As the California Supreme Court has summarized the issue: "In a related context, we observed that a magistrate's authority in determining whether to dismiss criminal charges is 'limited to determining whether sufficient or probable cause exists to hold the defendant for trial.' [Citation.] In *Uhlemann* [*People v. Uhlemann* (1973) 9 Cal.3d 662 [108 Cal.Rptr. 657, 511 P.2d 609]], we distinguished the probable cause test from the test used by a jury in determining guilt or innocence, namely, the 'beyond a reasonable doubt' construction. We stated: ' "Of course, the probable cause test is not identical with the test which controls a [trial] jury . . . . The jury must be convinced to a moral certainty and beyond a reasonable doubt of the existence of the crime charged in the information and of every essential element of that crime. But a magistrate conducting a preliminary examination must be

convinced of only such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused. [Citations.] In other words, 'Evidence that will justify a prosecution need not be sufficient to support a conviction. . . . An information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it. [Citations.]' " ' [Citations.]" (*Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1027 [13 Cal.Rptr.2d 551, 839 P.2d 1059].)

With these principles in mind, we turn to Hatch's various challenges to the sufficiency of the evidence received below.

B. *Belief That Lisa and Stacie Were Under Age 14*

Hatch contends counts 1 through 19 of the information must be dismissed because the prosecution cannot establish an essential element of the offenses charged in those counts. He argues that a necessary element of the charge in count 1 (§ 288, subd. (a)), is proof the victim was under the age of 14 years and a necessary element of the charges in counts 2 through 19 (§ 288.2, subds. (a), (b)), is proof the victims were under the age of 18 years. He then argues that if Stacie and Lisa were under the relevant ages, his subjective belief that they were more than 18 years of age would not be a defense to those offenses. (*In re Donald R.* (1993) 14 Cal.App.4th 1627, 1629-1630 [18 Cal.Rptr.2d 442].) From this predicate he concludes that his belief Stacie and Lisa were under 14 years of age is likewise irrelevant and, regardless of that belief, because Hersey was over the age of 18 years, the prosecution cannot establish the age elements of the offenses charged in counts 1 through 19.

However, Hatch is not charged with violating section 288, subdivision (a), or section 288.2, subdivision (a) or (b); instead, he is charged with attempting to violate those sections. A defendant is guilty of an attempt when he harbors a specific intent to commit the target crime and does a direct, although perhaps ineffectual, act toward its commission. (*People v. Ross* (1988) 205 Cal.App.3d 1548, 1554 [253 Cal.Rptr. 178].) The act need not be an element of the substantive offense, but only an immediate step in the present execution of the criminal design. (*Ibid.*)

The fact the prosecution cannot show that Hatch's intended victims were in fact under 14 years of age is irrelevant to his culpability for attempting the charged crimes. If Hatch had the specific intent to complete the target crimes, the impossibility of completing the crimes does not exonerate him

from attempting those offenses. As the court in *People v. Meyers* (1963) 213 Cal.App.2d 518, 523 [28 Cal.Rptr. 753], stated: "The courts of this state have not concerned themselves with the niceties of distinction between physical and legal impossibility, but have focused their attention on the question of the specific intent to commit the substantive offense. The hypothesis of the rule established in this state is that the defendant must have the specific intent to commit the substantive offense, and that under the circumstances, as he reasonably sees them, he does the acts necessary to consummate the substantive offense; but because of circumstances unknown to him, essential elements of the substantive crime are lacking. [Citations.] It is only when the results intended by the actor, if they happened as envisaged by him, would still not be a crime, then and only then, can he not be guilty of an attempt."

Thus, a defendant may be found guilty of attempted receipt of stolen property although the property is in fact not stolen (*People v. Rojas* (1961) 55 Cal.2d 252, 258 [10 Cal.Rptr. 465, 358 P.2d 921, 85 A.L.R.2d 252]), of attempted possession of a controlled substance although the substance is in fact talcum powder (*People v. Siu* (1954) 126 Cal.App.2d 41, 43-44 [271 P.2d 575]) and of attempted rape if he intended to rape a live person although unbeknownst to him the victim was dead (*People v. Thompson* (1993) 12 Cal.App.4th 195, 202-203 [15 Cal.Rptr.2d 333]).

In *People v. Reed* (1996) 53 Cal.App.4th 389 [61 Cal.Rptr.2d 658], the court concluded the defendant was guilty of attempted molestation of a child under age 14 (§§ 664, 288, subd. (a)) although his intended victims did not in fact exist but were instead fictitious constructs of a detective posing as the mother of 12- and nine-year-old victims. The *Reed* court reasoned, at 53 Cal.App.4th pages 396 through 397, that liability for an attempted crime does not require a " ' "present ability" to complete the crime, nor is it necessary that the crime be factually possible.' (*People v. Grant* (1951) 105 Cal.App.2d 347, 356 [233 P.2d 660])." It stated: "This rule of law is particularly important in determining culpability for intent crimes. Our courts have repeatedly ruled that persons who are charged with attempting to commit a crime cannot escape liability because the criminal act they attempted was not completed due to an impossibility which they did not foresee: 'factual impossibility is not a defense to a charge of attempt.' (*People v. Peppars* (1983) 140 Cal.App.3d 677, 688 [189 Cal.Rptr. 879].)" (*Reed* at p. 396.)

In *Reed*, the defendant attempted to distinguish prior cases by arguing the intended victims were "imaginary." The *Reed* court rejected the defendant's argument, stating at page 397 that defendant's argument rested on "a distinction without a difference. Applying the established 'perception' standard

set out above, if the circumstances had been as defendant believed them to be, he would have found . . . two girls under fourteen available for him to engage in lewd and lascivious conduct with them. Defendant's failure to foresee that there would be no children waiting does not excuse him from the attempt to molest. Defendant showed no honest and reasonable, or even unreasonable, belief that his actions would have a legal outcome. Thus, defendant's mistake of fact was not a defense to the crime of attempting to molest girls under 14 years of age." (*Reed, supra,* 53 Cal.App.4th at p. 397.)

■ A defendant is guilty of an attempt if the evidence shows he had the specific intent to commit the substantive offense and under the circumstances as he believed them to be took actions to consummate the substantive offense, even though circumstances unknown to him made completion of the substantive offense impossible. (*People v. Thompson, supra,* 12 Cal.App.4th at p. 203.) Therefore, a motion to dismiss the information should be denied if the evidence at the preliminary hearing would support a finding the defendant had the requisite specific intent and took actions to commit the substantive offense. (*Lupo v. Superior Court* (1973) 34 Cal.App.3d 657, 663 [110 Cal.Rptr. 185].)

■ The evidence and inferences permit a finding Hatch had the required specific intent to molest a child under the age of 14 years, count 1, and to distribute harmful matter intending to seduce a minor, counts 2 through 19: he was told Lisa and Stacie were under the age of 14 years and expressed fear of the consequences of being detected; and despite his belief of their young ages, he nonetheless tried to convince Lisa and Stacie to engage in sexual conduct with him.

C. *Attempt Liability Under Count 1*

Hatch argues the evidence of his February 1, 1998, acts at the hotel pool and parking lot were insufficient to constitute an attempt to violate section 288, subdivision (a), as charged in count 1; he contends there was no evidence he attempted to touch Hersey in a manner which would violate that section.

■ To be guilty of an attempt, a defendant harboring the required specific intent must commit a direct but ineffectual act toward commission of the target crime. (*People v. Ross, supra,* 205 Cal.App.3d at p. 1554.) The act need not be an element of the offense, but only constitute an immediate step in the execution of the criminal design. (*Ibid.*) No bright line distinguishes mere preparatory acts from commencement of the criminal design. The courts have recognized that the more clearly the intent to commit the

offense is shown, the less proximate the acts need be to consummation of the crime. (*People v. Berger* (1955) 131 Cal.App.2d 127, 130 [280 P.2d 136]; *People v. Fiegelman* (1939) 33 Cal.App.2d 100, 105 [91 P.2d 156].) "[T]he plainer the intent to commit the offense, the more likely that steps in the early stages of the commission of the crime will satisfy the overt act requirement." (*People v. Dillon* (1983) 34 Cal.3d 441, 455 [194 Cal.Rptr. 390, 668 P.2d 697].)

■ There was clear evidence Hatch intended to commit a lewd or lascivious act on a child under 14 years old. His Internet communications with Lisa, whom he believed to be 13, described several forms of sexual conduct in which they could engage when they had the opportunity. He stated during their February 1 Internet communication setting up their meeting later that day that he did not want to meet with her just to talk; and, while sitting together at the pool, he showed her pictures of himself nude and discussed what sexual activities he was planning. While harboring the specific intent to molest 13-year-old Lisa, Hatch tried to convince her to accompany him into his truck, and when Lisa later followed him to his truck, he again tried to convince her to enter the truck. These acts went beyond mere preparation for sexual molestation and constituted immediate steps in the present execution of the criminal design. (*People v. Ross, supra,* 205 Cal.App.3d at p. 1548.) The court in *People v. Reed, supra,* 53 Cal.App.4th 389, held that analogous actions were adequate for attempt liability, concluding the defendant's entry into a hotel room where he thought the victims were waiting and where the planned molestation was to occur "was clearly a step beyond mere preparation for the crime . . . [and] was an unequivocal first act in carrying out the intended crime." (*Id.* at p. 399.)

Hatch argues that under *People v. La Fontaine* (1978) 79 Cal.App.3d 176 [144 Cal.Rptr. 729] (overruled on other grounds in *People v. Lopez* (1998) 19 Cal.4th 282, 292 [79 Cal.Rptr.2d 195, 965 P.2d 713]), he cannot be convicted of attempted child molestation; he made no effort to touch Lisa while in his truck. He argues that under *La Fontaine,* merely soliciting Lisa to commit sexual acts is inadequate to support an attempt to violate section 288, subdivision (a). Even assuming *La Fontaine*'s analysis remains good law, there is some evidence Hatch did try to touch Lisa: after Lisa refused to enter his truck, Hatch exposed himself, masturbated and extended his semen-covered hand toward her. We conclude the evidence of Hatch's February 1, 1998, acts at the hotel is sufficient to support the charge in count 1.

### D. Sufficient Evidence of Dates of Offenses

Hatch argues there was insufficient evidence of the dates of occurrence of the offenses charged in counts 2 through 19. He also argues there was

insufficient evidence he possessed the obscene matter as charged in counts 20 and 21.

■ The purpose of the information is to apprise the defendant of the charges he must be prepared to meet at trial. The prosecution need not prove the date alleged in the information with exactness if the information adequately alleges the offenses took place before the filing of the information and within the period of limitations. (*People v. Lees* (1967) 257 Cal.App.2d 363, 369 [64 Cal.Rptr. 888].)

1. *Counts 2 Through 19*

■ Each of counts 2 through 19 alleges a date certain of the charged offense. Hatch does not suggest any of those dates trigger a statute of limitations bar to prosecution. Instead, he asserts that Hersey's testimony did not identify the date of each Internet conversation and therefore there is no evidence of the time each offense occurred.

However, a printed copy of each Internet conversation was admitted as an exhibit at the preliminary hearing, and at the top of each document Hersey made a handwritten notation of the date of the conversation.[11] Moreover, Hersey testified that her first contact with Hatch was his September 6, 1997, e-mail to Stacie asking her if she liked "older guys." This contact began her five-month period of e-mail contact with Hatch and demonstrates the charged offenses occurred within the period of limitations.

Hatch also argues there is no evidence of the date he learned Lisa and Stacie were 13 years old, and therefore the conduct forming the basis of many of the section 288.2, subdivisions (a), (b), offenses may have occurred before he became aware of their ages, which would exonerate him from culpability for those counts. There is ample evidence from which the trier of fact could infer Hatch knew of their ages at the inception of their communications. First, Hersey posted biographical information for both Stacie and Lisa, which is available to Internet users, stating their ages to be 13 years. Second, as to Hatch's understanding of Stacie's age, their September 8, 1997, communication contained Stacie's statement that she was 13 years old.

Finally, as to Hatch's understanding of Lisa's age, the evidence permits a trier of fact to infer Hatch knew Lisa's age during their first conversation on

---

[11]Hersey was asked how she could be certain of the dates of the various conversations. She testified that when she saved the file, the computer dated that file on the date it was created. As an example, she testified about the copy of her September 21, 1997, conversation with Hatch. She entered her handwritten notation of the September 21, 1997, date on that exhibit copy based on the computerized file date. Because all of the other pages contain handwritten notations in a similar handwriting, the trier of fact could infer the dates on all the pages within the exhibit were written by Hersey based on the same methodology.

September 15 because of the nature of their conversation on that date: Hatch asked her whether she had developed pubic hair and whether her breasts had developed; Hatch knew Lisa would have to sneak out of the house to avoid parental detection. Moreover, during their next conversation three days later, Lisa explicitly stated she was 13. Because Hatch showed neither surprise nor an unwillingness to continue his pursuit after this revelation, but instead told her he was using her picture as a source of erotic stimulation, the evidence permits the inference he was aware of her age from the inception of his communications with Lisa.[12]

### 2. Count 20

Hatch also argues the prosecution did not establish the date Hatch allegedly possessed obscene matter forming the basis of count 20. (§ 311.1.) However, count 20 did not allege possession of obscene matter, but rather the advertisement for sale and distribution of obscene matter depicting a person under the age of 18 years personally engaging in or personally simulating sexual conduct. Count 20 is based on Hatch's September 10, 1997, Internet message to Stacie. The date of this communication is established in the same manner as the dates of the communication set forth in counts 2 through 19. Hatch does not otherwise challenge the sufficiency of the evidence to support count 20.

### E. Evidence of Possession of Obscene Matter, Count 21

Count 21 (§ 311.11, subd. (a)) of the information alleged that on or about February 13, 1998, Hatch possessed child pornography. This count is based on the computer and floppy discs containing digitized photographs seized by police during the search of Hatch's home. An expert who viewed the pictures embedded on the floppy discs opined the pictures qualified as child pornography.

Although the date of the search does not appear in the record, testimony shows the search occurred sometime after February 6, 1998, but prior to the filing of the September 3, 1998, information.[13] This evidence is adequate to show Hatch possessed the floppy discs before the filing of the information

---

[12]It is clear from this record that Hatch was not only aware his intended victims were 13 years old, which is indeed why he sought them out in the first place, but that both of them were accessible to him as they resided in San Diego County. We return to this point in the discussion, *post.*

[13]At the August 25, 1998, preliminary hearing, Detective Jauregui testified he learned of Hersey's investigation during a February 6, 1998, meeting with Hersey's superiors. After receiving this information, police assumed the investigation and ultimately searched Hatch's home where the matter was found.

and within the period of limitations. (*People v. Lees, supra,* 257 Cal.App.2d at p. 369.)

Hatch argues count 21 must be dismissed because there was no evidence of the date he viewed the digitized photographs contained on the floppy discs. However, count 21 charged Hatch with violating section 311.11, subdivision (a), which proscribes knowingly possessing any matter depicting a person under 18 years of age engaging in or simulating sexual conduct knowing that the matter depicts a person under 18 years of age. As long as Hatch knew the digitized photographs depicted persons under age 18 engaging in sexual conduct, the precise dates on which he may have last viewed the photographs is irrelevant.

There was ample evidence to support the inference Hatch knew the digitized photographs depicted persons under age 18 engaging in sexual conduct. First, there was evidence Hatch was able, at some point in time, to view the photographs. The expert testified that although Hatch's computer did not have the software needed to view the photographs on the discs, the photographs could be viewed either elsewhere or by reinstalling the necessary software, and the photographs had at one time been viewable on Hatch's computer. Other evidence also supports the inference Hatch had the capability of viewing images that, like the images on the floppy disks, were digitized photographs.[14] Finally, a trier of fact could infer that Hatch, having manifested a clear interest in younger girls, would not have possessed these images and a computer capable of viewing them without having viewed them.

Because the evidence permits the inference Hatch had the ability to and did view the proscribed photographs, we consider whether a person viewing these photographs would have known they depicted persons under the age of 18 years engaged in the sexual conduct. The evidence showed that at least one photograph on the floppy discs depicted a child engaged in sexual conduct with an adult male.[15] Other photographs depicting young participants were also found on the discs. The evidence permits the inference that

[14]For example, Lisa electronically transmitted a digitized picture of herself to Hatch during their initial September 15, 1997, conversation and Hatch responded "wow lisa!!! you are beautiful!!!!". He also told Lisa three days later that he masturbated while "looking at [her] pretty picture." Hatch also sent Lisa a "JPG" formatted digitized picture of a nude girl, apparently under age 18, and asked Lisa whether she had "pointy and pink nipples like [the girl depicted in the photograph]," which was a detail Hatch could not have known unless he had viewed the transmitted photograph at some point in time.

[15]This child was so young, the court, in striking the expert's statement the child appeared to be five or six years old, stated "for someone obviously small, then I don't need an expert opinion; if someone is five or six years old, I don't think that's beyond the expertise of the average person."

a viewer of these photographs would have known the depicted participants were under the age of 18 years.

For all of the above reasons, and under the standard of review set out earlier, we reject Hatch's various challenges to the sufficiency of the evidence received below.

## III

### Constitutional Issues

The central question presented by the petition is the constitutionality of section 288.2 under both the First Amendment and the so-called dormant commerce clause, undue burden on interstate commerce. We set out our review standard for these assertions and then examine first the latter argument, that section 288.2 violates the commerce clause as unduly burdening interstate commerce, and finally proceed to a discussion of whether section 288.2, in both subdivisions, comports with the requirements of the First Amendment.[16]

### A. Standard of Review

■ An "as applied" challenge to a statute seeks "relief from a specific application of a facially valid statute . . . to an individual . . . under allegedly impermissible present restraint . . . as a result of the manner . . . in which the statute . . . has been applied." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) Such a challenge "contemplates analysis of the facts of a particular case . . . to determine the circumstances in which the statute . . . has been applied and to consider whether . . . the application deprived the individual to whom it was applied of a protected right. [Citations.]" (*Ibid.*)

■ Apart from an as-applied challenge, a litigant may also make a challenge to the face of the statute. However, the United States Supreme

---

[16]The People argue Hatch waived his constitutional challenges to the validity of the statute because he did not raise them at the preliminary hearing. Hatch did, however, properly raise these matters on his section 995 motion and received an adverse ruling thereon. Thus, these issues are properly before us. "[T]he constitutionality of the statute or ordinance under which a defendant is convicted is a proper subject for appeal (7 Witkin, Summary of Cal. Law [(9th ed. 1988)] Constitutional Law, § 84, p. 134 ['a defendant in a criminal or civil proceeding brought under a statute may challenge its constitutionality in the trial court and appeal from an adverse decision . . . .'])." (*People v. Gonzalez* (1996) 12 Cal.4th 804, 822 [50 Cal.Rptr.2d 74, 910 P.2d 1366].)

Court has held that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances exists under which the Act would be valid.* The fact that the [Act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." (*United States v. Salerno* (1987) 481 U.S. 739, 745 [107 S.Ct. 2095, 2100, 95 L.Ed.2d 697], italics added.) Thus, a pretrial commerce clause argument by a California resident whose victim also resided in California necessarily is a facial challenge to the statute, rather than an as applied challenge to a particular case, instance or pattern of attempted enforcement of a statute.

 As our own Supreme Court has observed with respect to the same proposition: "A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual. [Citation.] ' "To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' [Citations.]" (*Tobe v. City of Santa Ana, supra,* 9 Cal.4th at p. 1084.)

An exception to the limited scope of a facial challenge is the assertion that a statute is overbroad, restricting speech protected under the First Amendment, and "the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech." (*Secretary of State of Md. v. J. H. Munson Co.* (1984) 467 U.S. 947, 967-968 [104 S.Ct. 2839, 2852-2853, 81 L.Ed.2d 786].)

B. *Section 288.2 and the Commerce Clause*

 Hatch, as a California resident who is alleged to have engaged in strictly intrastate communications, cannot assert that application of section 288.2 to him poses any unique or particular burden on interstate commerce. Because he is only being charged with intrastate activity, any intrusion on interstate commerce, if it occurs, would occur in all prosecutions under section 288.2. Given these circumstances, his commerce clause challenge is a facial challenge to the statute. (See *Tobe v. City of Santa Ana, supra,* 9 Cal.4th at p. 1084.)

The central case relied upon by Hatch for the commerce clause point[17] is *American Libraries Ass'n v. Pataki* (S.D.N.Y. 1997) 969 F.Supp. 160 (*Pataki*), enjoining enforcement of a New York statute similar to section 288.2, but lacking an intent-to-seduce element.[18] In our view, *Pataki* rests on premises inapplicable to the present matter. For these reasons, we do not follow *Pataki*.

The two principal bases for the holding in *Pataki* are that (1) the very nature of the Internet requires national, rather than state-by-state, regulation, and (2) the statute appeared to operate extraterritorially and thus impose New York policies on other states. We examine each of these bases in turn, and also the relevance of the element of intent, the central distinction between the statute at issue in *Pataki* and those before us.

### 1. *Need for National Regulation*

*Pataki*'s first point, which is at the heart of Hatch's commerce clause arguments, is a sort of preemption argument: that simply logging on the Internet automatically places one beyond the reach of state criminal prosecution. "The Internet, like the rail and highway traffic in [interstate commerce] cases, requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations." (*Pataki, supra,* 969 F.Supp. at p. 182.)

New York's attempted regulation, reasoned *Pataki*, meant that "an Internet user cannot foreclose access to her work from certain states or send differing versions of her communications to different jurisdictions" (*Pataki, supra,* 969 F.Supp. at p. 183), and thus "[t]he need for uniformity in this unique sphere of commerce requires that New York's law be stricken as a violation of the Commerce Clause." (*Ibid.*) However, section 288.2 does not criminalize "access," or require "differing versions of . . . communication [in] different jurisdictions" (*Pataki, supra,* 969 F.Supp. at p. 183); it instead

---

[17]Hatch and the various parties and amici curiae have also cited and discussed a number of out-of-state and federal district court cases. In view of the limited precedential value of these matters to the resolution of the questions before us, we do not unduly extend this opinion by discussion of those cases.

[18]New York Penal Law section 235.21, subdivision 3 as amended made it a felony for an individual "[k]nowing the character and content of the communication which, in whole or in part, depicts actual or simulated nudity, sexual conduct or sado-masochistic abuse, and which is harmful to minors, [to] intentionally use[] any computer communication system . . . to initiate or engage in such communication with a person who is a minor." "Harmful to minors" was defined elsewhere in a manner similar to the definition in California Penal Code section 313, discussed *ante.*

proscribes communicating defined matter to a minor for purposes of seduction. Because the predicate assumption underlying *Pataki*'s holding is without any relevance to the case before us, we decline to follow it.[19]

While it may be true that Internet communications routinely pass along interstate lines, we do not believe this general proposition can be employed, as suggested by Hatch, to insulate pedophiles from prosecution simply *by reason of* their usage of modern technology.[20] Such a view of what our Constitution requires is, in our opinion, completely inappropriate.

That is to say, the validity of the *Pataki* analysis *vel non* is not controlling here because the *intent* to seduce element in section 288.2 is a distinction of the utmost significance. While a ban on the simple *communication* of certain materials may interfere with an adult's legitimate rights, a ban on communication of specified matter to a minor *for purposes of seduction* can only affect the rights of the very narrow class of adults who intend to engage in sex with minors. We have found no case which gives such intentions or the communications employed in realizing them protection under the dormant commerce clause.[21]

---

[19]*Pataki* and the dissent stress that use of the Internet necessarily implicates interstate commerce because one cannot know the physical location of another person on the Internet. While this may be correct as an abstract point, it is clear that geography, insofar as it involved access to his intended victims, was a priority for Hatch, as it would be for any other adult whose intent is to seduce a child. Here, Hatch knew his intended victims were not only Californians, but also fellow residents of San Diego County. Hatch in his very earliest communications with Stacie and Lisa mentioned "UTC" (University Town Center) and various area streets, while often importuning his intended victims for personal meetings. As we point out in another context later, what Hatch did was not some form of interstate commerce so much as a localized stalking of accessible, local California victims. This simply is not and cannot be construed to be a constitutionally protected activity.

[20]We note here that Hatch, amicus curiae Appellate Defenders, and the dissent suggest an appropriate resolution of the burden on commerce issue is for parents of minors to install systems on their computers which preclude access by minors to indecent materials. The *Reno* court rejected this proposition, however, as ineffective "[w]ithout the impossible knowledge that every guardian in America is screening [for indecent materials]." (*Reno, supra,* 521 U.S. at p. 881 [117 S.Ct. at p. 2349].) Agreeing with this view, and also finding the statute before us to have little or no impact on interstate commerce, we do not further address this matter.

[21]Like *Pataki*, the statutes considered in *Cyberspace, Communications, Inc. v. Engler* (E.D.Mich. 1999) 55 F.Supp.2d 737, and *American Civil Liberties Union v. Johnson* (10th Cir. 1999) 194 F.3d 1149, were not limited to persons attempting to seduce minors. We think with respect to Hatch's commerce clause argument, it is also worth noting that Congress has specifically prohibited interstate travel for the purpose of engaging in sexual conduct with minors (18 U.S.C. § 2423(b)) and that in interpreting this prohibition one court has reiterated what we believe is self-evident: "[O]ne does not have a fundamental right to travel for illicit purposes." (*U.S. v. Brockdorff* (D.D.C. 1997) 992 F.Supp. 22, 25.)

Rather, as another appellate court observed, in rejecting a commerce clause challenge to a New York penal statute[22] with provisions similar to section 288.2, "we cannot conceive of any legitimate commerce involving the sending of graphic images to minors *while at the same time attempting to lure them into engaging in sexual activity.*" (*People v. Foley, supra*, 257 A.D.2d 243 [692 N.Y.S.2d 248, 256], italics added.) We agree completely.

### 2. *Extraterritorial Enforcement of California Law*

The *Pataki* court also found that "[t]ypically, states' jurisdictional limits are related to geography; geography, however, is a virtually meaningless construct on the Internet." (*Pataki, supra*, 969 F.Supp. at p. 169.) Hypothesizing that an artist in California seeking to display work harmful to minors to an Oregon buyer "could not employ his virtual [Internet] studio to do so without risking prosecution under the New York law" (*id.* at p. 174), the *Pataki* court held that "New York has deliberately imposed its legislation on the Internet and, by doing so, projected its law into other states whose citizens use the Net." (*Id.* at p. 177.)

The assumption that extraterritorial enforcement of state criminal statutes is normative is incorrect. As our Supreme Court has recently observed with respect to state statutes defining jurisdiction over criminal acts, "[g]enerally, pursuant to section 777, a 'person is liable to punishment by the laws of this State, for a public offense committed by him therein,' except where the offense is cognizable exclusively in federal court. In addition, pursuant to section 27, subdivision (a)(1), persons may be punished 'under the laws of this state' if they 'commit, in whole or in part, any crime within this state.' Pursuant to section 778a, subdivision (a), a person is punishable in the same manner as if the crime had been committed entirely within this state if the person does 'any act' within this state 'in execution or part execution' of an intent to commit a crime anywhere, culminating in its commission within or without the state." (*People v. Morante* (1999) 20 Cal.4th 403, 418 [84 Cal.Rptr.2d 665, 975 P.2d 1071], fns. omitted.)[23]

---

[22]New York Penal Law section 235.22 prohibits (1) sending defined harmful matter to minors (2) for the purpose of inducing the minor to engage in sexual activity. The statute invalidated by the *Pataki* court, Penal Law section 235.21, subdivision 3, lacked the second element, attempting to induce sexual activity by the minor. (*People v. Foley* (1999) 257 A.D.2d 243 [692 N.Y.S.2d 248, 256].) As will appear, this distinction in the statutes is critical.

[23]An earlier case, involving a charge of conspiracy, had observed that "statutes must be construed in the light of the general principle that, ordinarily, a state does not impose punishment for acts done outside its territory. [Citations.]" (*People v. Buffum* (1953) 40 Cal.2d 709, 715-716 [256 P.2d 317].) The court in *People v. Morante, supra*, 20 Cal.4th at pages 422-429, carved out an exception to the general principle in conspiracy cases but did not

Contrary to *Pataki*'s conclusion the New York statute "projected its law into other states" (*Pataki, supra,* 969 F. Supp at p. 177), here there is no reason to suppose California would attempt to impose its policies on other states in light of the relevant California penal statutes covering jurisdiction over public offenses (§§ 27, 777, 778a),[24] which generally bar punishment for wholly extraterritorial offenses. Thus there is no reason at all to assume California prosecutors will attempt to stifle interstate commerce by filing charges for acts committed in other jurisdictions, or where only "de minimis" acts (*People v. Morante, supra,* 20 Cal.4th at p. 436), such as those hypothesized in *Pataki*, are committed within this state. Because there is no reason to suppose enforcement of section 288.2 will differ from that which is historically and statutorily permissible, *Pataki*'s second fundamental assumption is thus without relevance to our consideration of the statutes.

In short, given the requirement that those charged must intend to seduce and the additional requirement that they must commit at least an attempt here, no rational analysis supports the proposition section 288.2 imposes any burden on interstate commerce, as (1) such burdens as may exist are not upon any protected right of commerce at all, and (2) enforcement of the statute is not likely to significantly, or at all, burden interstate commerce.

Thus, we must reject Hatch's contention that on its face section 288.2 unduly burdens interstate commerce.

C. *Section 288.2 and the First Amendment*

Relying on the exception to the limited scope of facial challenges that arises under the First Amendment (*Secretary of State of Md. v. J. H. Munson Co., supra,* 467 U.S. at pages 967-968 [104 S.Ct. at pages 2852-2853]), Hatch asserts that without regard to the status of his own speech, section 288.2 will unduly chill otherwise protected speech. In contrast to the previous challenge, however, in which Hatch cited us primarily to a decision of a federal district court, the authority primarily relied upon by Hatch is a recent case from the United States Supreme Court, whose constitutional

---

otherwise modify application of the principle to cases involving offenses such as those charged herein. (See also *People v. Burt* (1955) 45 Cal.2d 311, 313-314 [288 P.2d 503, 51 A.L.R.2d 948].)

[24]"[S]ection 27, subdivision (a)(1), affords our courts jurisdiction over crimes partially committed within this state, and section 778a, subdivision (a), affords our courts jurisdiction over crimes committed outside the state if the defendant formed the intent and committed 'any act' within this state in whole or partial execution of that intent." (*People v. Morante, supra,* 20 Cal.4th at p. 434.)

adjudications, in marked contrast to those of federal district courts, are binding on us.[25]

## 1. *Reno and the CDA*

The case relied upon by Hatch is of course *Reno, supra,* 521 U.S. 844, a challenge to the earlier cited provisions of the CDA, making it a criminal offense to make an indecent transmission or a patently offensive display to a minor. In *Reno,* the court noted but did not decide the proposition that the Internet, by reason of its very character, may not constitutionally be subject at all to congressional regulation for indecency.[26] We examine each of these facets in turn.

### a. *Indecent Transmission*

Title 47 United States Code section 223(a), set out earlier, provides in pertinent part for a prison term for one transmitting interstate or foreign telecommunications containing "any comment, request, suggestion, proposal, image, or other communication which is obscene or indecent, knowing that the recipient . . . is under 18 years of age." The statute did not however define "indecent"[27] as therein used, nor require that the prohibited material be that "utterly without redeeming social importance for minors." (*Ginsberg v. New York* (1968) 390 U.S. 629, 646 [88 S.Ct. 1274, 1284, 20 L.Ed.2d 195].)

The requirements for defining that matter which may be prohibited were set out in *Miller v. California* (1973) 413 U.S. 15, 24 [93 S.Ct. 2607, 2615, 37 L.Ed.2d 419]: "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest [citations]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by

[25]The First Amendment challenge, while more substantial than the commerce clause argument, still must demonstrate an *unmistakable* constitutional violation: "As we have pointed out above, to succeed in a facial challenge to the validity of a statute or ordinance the plaintiff must establish that ' "the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional provisions." ' [Citation.] All presumptions favor the validity of a statute. The court may not declare it invalid unless it is clearly so. [Citation.]" (*Tobe v. City of Santa Ana, supra,* 9 Cal.4th at p. 1102.)

[26]Hatch asserts the Internet must be regulated by Congress, rather than the states, because of its interstate character. Contrariwise, one of the three appellate judges hearing the challenge to the CDA constitutionality in *Reno* found that "Congress may not regulate indecency on the Internet at all." (*American Civil Liberties Union v. Reno* (E.D.Pa. 1996) 929 F.Supp. 824, 877, quoted in *Reno, supra,* 521 U.S. at p. 863, fn. 30 [117 S.Ct. at p. 2340], where the Supreme Court noted but declined to consider the assertion.)

[27]Hatch does not dispute the proposition that obscenity, if properly defined, may properly be prohibited. (See, e.g., *Reno, supra,* 521 U.S. at p. 883 [117 S.Ct. at p. 2350].)

the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

The CDA statute defined prohibited material by reference to only one of the three *Miller* prongs. The *Reno* court found the absence of the other *Miller* criteria in the CDA prohibition to be fatal, in particular because omitting the societal value requirement essentially foreclosed appellate limitation upon the reach of the statute, leaving all contested issues merely ones of local fact. (*Reno, supra,* 521 U.S. at pp. 873-874 [117 S.Ct. at pp. 2345-2346].)

Because "[t]he breadth of this content-based restriction of speech" was excessive (*Reno, supra,* at p. 879 [117 S.Ct. at p. 2348]), the *Reno* court found the indecent transmission provision "threatened to torch a large segment of the Internet community" and thus the provision was unconstitutional. (*Reno, supra,* 521 U.S. at p. 882 [117 S.Ct. at pp. 2349-2350.)

 b. *Patently Offensive Display*

The second section of the CDA considered by the *Reno* court involved the patently offensive display of various matter to minors. Title 47 United States Code section 223(d) provides in pertinent part for a two-year prison term for one using an interactive computer service to (a) send to a person under age 18 or (b) display in a manner available to persons under age 18 "any comment, request, suggestion, proposal, image, or other communication that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs."[28]

Here again, the *Reno* court was unable to sustain the statute, noting that the "patently offensive" language was qualified only by reference to " 'sexual or excretory activities or organs,' " and " 'measured by contemporary community standards.' " (*Reno, supra,* 521 U.S. at p. 871, fn. 35 [117 S.Ct. at p. 2344].) Such vagueness resulted in a situation where "[i]n order to deny minors access to potentially harmful speech, the CDA effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to each other." (*Reno, supra,* 521 U.S. at p. 874 [117 S.Ct at p. 2346].)

In sum, the *Reno* court found that "the CDA lacks the precision that the First Amendment requires when a statute regulates the content of speech," as

---

[28]While Justice O'Connor and the Chief Justice parsed 47 United States Code section 223(d)(1)(A) and (B) as setting out separate offenses (*Reno, supra,* 521 U.S. at p. 886 [117 S.Ct. at p. 2352] (conc. & dis. opn. of O'Connor, J.)), the majority did not follow this analysis of the statute. (*Id.* at p. 859, fn. 25 [117 S.Ct. at p. 2338].)

the CDA did. (*Reno, supra,* 521 U.S. at p. 874 [117 S.Ct. at p. 2346].) Central to the holding was the court's finding that the CDA "would confer broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech who might simply log on and inform the would-be discoursers that his 17-year-old child . . . would be present." (*Reno, supra,* 521 U.S. at p. 880 [117 S.Ct. at p. 2349]; and see discussion, *id.,* at pp. 874-880 [117 S.Ct. at pp. 2346-2349].)

## 2. *Application to This Case*

 Relying on the language of *Reno,* Hatch urges that section 288.2, like the CDA sections considered in *Reno,* is overbroad. *Reno,* however, concerned a blanket prohibition of dissemination of harmful matter to minors, which had the essential effect of limiting all relevant discourse to a child's level.[29]

There is simply no comparable effect upon any otherwise protected communications by reason of section 288.2, which prohibits sending (1) defined harmful matters (2) to minors and (3) *for the purpose of seducing them.*[30]

*Reno* rested its overbreadth finding on two points: (1) banned matter was *not* defined so as to exclude protected communication; and (2) banned matter *was* defined to refer to a necessarily variable community standard. In this case, however, banned matter is properly defined, and there is, as set forth in section 313, a single statewide community standard test, which precludes possible inconsistent results for varying local interpretations of the same acts.[31]

---

[29]"Knowledge that . . . one or more members of a 100-person chat group will be minor —and therefore that it would be a crime to send the group an indecent message—would surely burden communications among adults. [¶] . . . These limitations must inevitably curtail a significant amount of adult communication on the Internet. . . . [¶] . . . [The] open-ended prohibitions [of the CDA] embrace all nonprofit entities and individuals posting indecent messages. . . ." (*Reno, supra,* 521 U.S. at pp. 876-877 [117 S.Ct. at p. 2347], fns. omitted.)

[30]As an example of the legislation's overbreadth, *Reno* noted that "[u]nder the CDA, a parent allowing her 17-year-old to use the family computer to obtain information on the Internet that she, in her parental judgment, deems appropriate could face a lengthy prison term." (*Reno, supra,* 521 U.S. at p. 878 [117 S.Ct. at p. 2348].) No such absurdity is suggested as likely or even possible in view of section 288.2's intent-to-seduce element.

[31]In this regard we note that similar statutory language in section 311 was upheld as sufficiently specific in *Bloom v. Municipal Court* (1976) 16 Cal.3d 71, 80-81 [127 Cal.Rptr. 317, 545 P.2d 229]. We also note that there is no question that the state may protect minors from material which is not obscene by adult standards. (*Sable Communications of Cal., Inc. v. FCC* (1989) 492 U.S. 115, 126 [109 S.Ct. 2829, 2836-2837, 106 L.Ed.2d 93].)

The central point here is that a person charged with violation of section 288.2 is not a "discourser" (*Reno, supra,* 521 U.S. at p. 880 [117 S.Ct. at p. 2349]) seeking merely to communicate indecency to other adults and inno-, cently running afoul of an overbroad statute. Rather, the statute punishes those who seek not discourse, but intercourse and other sexual *activity*, and who have identified intended victims for pursuit and seduction.

For this reason, not only is *Reno* inapplicable to this case, but the case of *People v. Barrows* (1998) 177 Misc.2d 712 [677 N.Y.S.2d 672], invalidating the earlier referenced New York penal statute on overbreadth grounds for the second *Reno* rationale, variation in community standards, has no application to this case.

Further, because the New York statute lacked the intent-to-seduce element of our statute, the heckler's veto point, chilling effect upon chat room communications, noted in *Reno* and *Barrows* is irrelevant. Section 288.2 by its terms is inapplicable to communications *other* than those made to an identifiable minor person, whether fictitious or not, *for the purpose of seduction*, and thus is incapable of infringement by general, nonspecific communications made without any intent to seduce an identifiable minor person.

It is precisely this distinction in the basic type of the communication which is crucial. An overbroad statute chills classical forum[32] communications, such as those that occur in the chat rooms frequented by Hatch. Section 288.2, in contrast, only addresses those communications in which an adult seeks to seduce a child.

In the case of forum communications, an overbroad statute necessarily chills protected adult communications by permitting the heckler's veto asserted by or on behalf of a minor. In the case of that species of dialogue in which a pedophile stalks an identified minor child by sending him or her direct Internet messages, no content-restricting rules permitting a heckler's veto are involved.[33] The distinction, as we have noted earlier, is critical. The statutes rejected in *Reno* and *Pataki* involved cases where the rights of

---

[32]A "forum" was "the marketplace or public place of an ancient Roman city consisting of an open place or square . . . and forming the center of judicial and public business." (Webster's 3d New Internat. Dict. (1993) p. 896.) Secondary meanings include "a public meeting place for open discussion" or "a medium of open discussion." (*Ibid.*)

[33]The present case is a precise example of the point: Hatch met "Lisa" and "Stacie" in chat rooms, but committed no criminal act until he began to send "Lisa" and "Stacie" private messages.

adults to receive material could have been diminished by a statute prohibiting certain communication to children. No such danger exists under section 288.2.[34]

The activity prohibited by the California statute is far more akin to conduct than communication. As the California Supreme Court has recently determined, in the context of review of an ordinance prohibiting the "aggressive solicitation" of money,[35] although "some recent decisions of the California and federal intermediate appellate courts have concluded that, under the California Constitution, ordinances directed at solicitation should be viewed as [having to] satisfy the strict scrutiny test," those decisions were erroneous. (*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 357 [93 Cal.Rptr.2d 1, 993 P.2d 331].)

Instead, characterizing the ordinance as "directed at activity" (*Los Angeles Alliance for Survival v. City of Los Angeles, supra,* 22 Cal.4th at p. 357), and noting the long-standing California precedents treating statutes on solicitation as regulating the time, place and manner or conduct of the solicitor rather than the content of his or her speech, the court went on to hold that "a court should avoid a constitutional interpretation that so severely would constrain the legitimate exercise of government authority in an area in which such regulation long has been acknowledged as appropriate." (*Id.* p. 378.) Thus, the court held that "regulations . . . that single out the public solicitation of funds for distinct treatment, should not be viewed as . . . constitutionally suspect." (*Ibid.*)[36]

---

[34]Justice O'Connor's concurring and dissenting opinion in *Reno* (joined in by the Chief Justice) made explicit reference to the concepts here discussed, noting that in her view the CDA provisions were "constitutional as applied to a conversation involving only an adult and one or more minors—*e.g.,* when an adult speaker sends an e-mail knowing the addressee is a minor, or when an adult and [a] minor converse by themselves or with other minors in a chat room. In this context . . . [r]estricting what the adult may say to the minors in no way restricts the adult's ability to communicate with other adults. He is not prevented from speaking indecently to other adults in a chat room (because there are no other adults participating in the conversation) and he remains free to send indecent e-mails to other adults. *The relevant universe contains only one adult,* and the adult in that universe has the power to refrain from using indecent speech . . . ." *Reno, supra,* 521 U.S. at pp. 892-893 [117 S.Ct. at p. 2355] (conc. & dis. opn. of O'Connor, J.), italics added.)

[35]The matter was reviewed on certification of the question from the Ninth Circuit pursuant to California Rules of Court, rule 29.5, and the decision was by a vote of five to two, with Justice Werdegar concurring, and Justices Mosk and Kennard dissenting. While the decision interprets the California rather than the federal Constitution, its reasoning is applicable herein.

[36]See also *People v. Zimmerman* (1993) 15 Cal.App.4th Supp. 7, 11 [19 Cal.Rptr.2d 486], discussing section 647, subdivision (c), prohibiting begging: "In *Ulmer v. Municipal Court* [(1976)] 55 Cal.App.3d 263 [127 Cal.Rptr. 445], the California Court of Appeal upheld the statute's validity under the California and United States Constitutions. In determining begging and soliciting alms is not constitutionally protected activity, the court explained: 'Regulation

The above reasoning, we believe, is fully applicable to the circumstances of this case. Section 288.2 is not directed at speech, but at the *activity* of attempting to seduce a minor. While one might argue that under *Reno* adults are free to address indecencies to an Internet audience while indifferent to the presence of children in that audience, it is only when the focus has shifted to the use of such communicated indecency in the attempted seduction of a child, a process we apprehend will be accomplished by direct, one-to-one communication that the present statute's prohibitions are violated. Thus, the only chilling effect of section 288.2 is on pedophiles who intend that their statements will be acted upon by children. Given the intention with which they are made, such statements are not entitled to the extraordinary protection of the First Amendment (*Los Angeles Alliance for Survival v. City of Los Angeles, supra,* 22 Cal.4th at p. 378; *People v. Zimmerman, supra,* 15 Cal.App.4th at p. Supp. 11.)[37]

Finally, we note that the California Supreme Court has not only stressed the strength of the state's interest in the area, but also noted that section 288.2 prohibits "criminal sexual misconduct."[38] Because it is primarily

---

of conduct bearing no necessary relationship to the freedom to speak, write, print or distribute information or opinion does not abridge the guarantees of the First Amendment. [Citations omitted.] Begging and soliciting for alms do not necessarily involve the communication of information or opinion; therefore, approaching individuals for that purpose is not protected by the First Amendment.' [Citation.] The Legislature's intent in enacting the statute was to prohibit individuals from going about on the streets accosting others, i.e., walking up to and approaching others, for handouts. [Citation.] '[T]he statute does not extend to one "who merely sits or stands by the wayside." ' [Citation.] Thus, the statute proscribes certain *conduct* by an individual who begs or solicits alms, rather than the *message* he seeks to convey. The mere fact that the proscribed act may be accomplished by speech does not in and of itself bring the activity within the protection of the First Amendment." (Fns. omitted.)

[37]Hatch also argues that even if he is properly subject to section 288.2, he has standing to assert the rights of others not subject to such punishment. But, as we have observed, the class of persons subject to section 288.2 is limited to those seeking to seduce minors by transmission of specified prohibited materials, and it does not appear the section might improperly be applied to them.

[38]"Above and beyond the protection afforded to all victims of sexual assault, the Legislature has determined that children are uniquely susceptible to 'outrage' and exploitation. Hence, special laws on the subject of sex with children have been enacted. They expand the kinds of *acts which may be deemed criminal sexual misconduct,* and they generally operate without regard to force, fear, or consent. (See, e.g., §§ 261.5 [sexual intercourse with nonspouse under 18], 266 [enticing female under 18 into prostitution], 266j [procuring child under 16 for lewd act], 267 [abducting person under 18 for prostitution], 285 [incest], *288.2 [distributing harmful materials to minor for sexual purpose]*, 288.5 [continuous abuse of child by resident molester].)" (*People v. Scott* (1994) 9 Cal.4th 331, 341-342 [36 Cal.Rptr.2d 627, 885 P.2d 1040], italics added; see also our decision in *Angie M. v. Superior Court* (1995) 37 Cal.App.4th 1217, 1225 [44 Cal.Rptr.2d 197], referring to § 288.2 ["protecting minors from sexual exploitation"].)

conduct rather than speech that is subjected to regulation, the statute does not infringe upon the First Amendment.[39]

In light of the foregoing, we are compelled to uphold the legislative enactment. "[S]ince it is manifest that the ordinance is capable of applications which do not offend the Constitution in the manner suggested by petitioners . . . , the ordinance must be upheld." (*Tobe v. City of Santa Ana, supra,* 9 Cal.4th at p. 1102.)

Hatch has not set out any credible scenario under which the application of section 288.2 to those persons who are liable to punishment under California law is constitutionally infirm.[40] We thus deny Hatch's constitutional arguments, instead deferring to "the legitimate exercise of government authority in an area in which such regulation long has been acknowledged as appropriate." (*Los Angeles Alliance for Survival v. City of Los Angeles, supra,* 22 Cal.4th at p. 378.)

IV

*Statutory Construction*

We finally must determine whether, as a matter of statutory construction, the section 288.2, subdivision (a), prohibition on the attempted seduction of minors with harmful matter "by any means" includes Internet communications as Hatch maintains that it does not.[41] As will appear, the question answers itself.

A. *Standard of Review*

The fundamental consideration is that we must adhere to the plain meaning of the statutory language in question. Our Supreme Court has often

[39]"[T]hose who choose to employ conduct as a means of expression must make sure that the conduct they select is not generally forbidden." (*Barnes v. Glen Theatre, Inc.* (1991) 501 U.S. 560, 580-581 [111 S.Ct. 2456, 2468, 115 L.Ed.2d 504] (conc. opn. of Scalia, J.)

[40]Citing a definition of "seduce" that states that it means "to induce to engage in unlawful sexual intercourse," Hatch argues his acts involved "pure speech" rather than conduct by focusing on the "induce" portion of the definition. We do not agree. "[W]hen the objectives of the injunction are considered and the words of the provision are read in context," (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1118 [60 Cal.Rptr.2d 277, 929 P.2d 596]; see also *People v. Hamilton* (1998) 61 Cal.App.4th 149, 155-156 [71 Cal.Rptr.2d 359], and *People v. Antoine* (1996) 48 Cal.App.4th 489, 496-497 [56 Cal.Rptr.2d 530]), it is the "unlawful sexual intercourse" portion of the definition which is important. This is of course conduct, not speech.

[41]Because this assertion assumes a proposition which we have earlier rejected, the unconstitutionality of section 288.2, subdivisions (a) and (b), we need not unduly prolong discussion of this point.

reiterated "the rule that courts should give statutory words their plain or literal meaning unless that meaning is inconsistent with the legislative intent apparent in the statute. [Citation.]" *(People v. Allen* (1999) 21 Cal.4th 846, 859 [89 Cal.Rptr.2d 279, 984 P.2d 486].)

## B. *Application*

■ Hatch argues that the phrase "by any means" should not be read to include the Internet, but we are unable to perceive any ambiguity whatsoever in the statutory language: "any means" means "any means," and thus necessarily *does* include usage of the Internet to affect the prohibited acts.[42] The subsequent passage of the more specific section 288.2, subdivision (b), which is explicitly applicable to Internet communications, does nothing to alter the fact of the necessarily plain meaning of the prior statute.

■ " 'It is fundamental that legislation should be construed so as to harmonize its various elements without doing violence to its language or spirit.' [Citation.]" *(People v. Garcia* (1999) 21 Cal.4th 1, 6 [87 Cal.Rptr.2d 114, 980 P.2d 829].) ■ Absent any ambiguity, and in order to harmonize the two statutes, the prior statute must be read to also include Internet communications.

Thus, both statutes apply to Hatch's conduct, and we reject his contrary arguments.

DISPOSITION

The petition for writ of mandate is denied.

Haller, J., concurred.

**McDONALD, J.,** Concurring and Dissenting.—Although I concur with the result of the majority opinion that the trial court correctly denied Hatch's motion to set aside counts 1 and 20 through 23, I do not concur that Penal Code section 288.2, subdivision (b)[1] is constitutional under the commerce clause and the First Amendment. I believe, as have other courts that have

---

[42]The single record matter supporting Hatch's argument is in the legislative history, as one committee report stated the bill enacting sections 288.2, subdivision (b) "would expand the law." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 181 (1997-1998 Reg. Sess.) as amended June 16, 1997.) Such a statement may not, however, overcome the plain meaning of the words, which carry a contrary import, particularly as other committee reports stated the measure was "a clarification of existing law rather than an addition to it." (Sen. Com. on Pub. Safety, Analysis of Assem. Bill No. 181 (1997-1998 Reg. Sess.) as amended Apr. 8, 1997.)

[1]All statutory references are to the Penal Code unless otherwise specified.

considered substantively indistinguishable statutes, that facial challenges under the commerce clause and the First Amendment, when properly analyzed, compel the conclusion that section 288.2, subdivision (b) is unconstitutional. I also do not concur that section 288.2, subdivision (a) prohibits distribution of harmful matter over the Internet. I believe that under traditional principles of statutory construction section 288.2, subdivision (a) does not apply to Internet communications. The statutory construction principle relied on by the majority to reach a contrary conclusion—"the question answers itself" (maj. opn., *ante*, pt. IV.) is one heretofore unknown to me. Because section 288.2, subdivision (b) is unconstitutional and section 288.2, subdivision (a) is inapplicable, I would direct the trial court to dismiss counts 2 through 19.

The majority, expressing pursuit of the admirable goal of brevity in appellate court opinions, announces it will disregard numerous opinions from other jurisdictions because of the "limited precedential value" of those opinions. (Maj. opn., *ante*, at p. 194, fn. 17.) Although the goal of brevity is laudable, I cannot similarly discount the value of those other courts' analyses. Those courts have in my view correctly applied the same commerce clause and First Amendment principles that should guide our constitutional analysis here. I recognize the majority states section 288.2 has the crucial or critical distinguishing characteristic of an intent to seduce element not contained in some statutes considered by other courts. However, the majority does not explain how that crucial or critical difference in the statutory language vitiates the facial commerce clause and First Amendment defects in the statute. Accordingly, although my discussion of cases from other jurisdictions lengthens this opinion, I do not share the majority opinion's view that those cases are irrelevant. Paraphrasing Robert Frost, two roads diverged and the majority took the one less traveled by, and that has made all the difference.

Because of the brevity of the majority's constitutional and statutory interpretation analysis, I am compelled to conduct a de novo analysis of the validity of section 288.2, subdivision (b) under the commerce clause and the First Amendment and to explain in detail my interpretation of the scope of section 288.2, subdivision (a). I do not understand the majority to have conducted a facial analysis in response to Hatch's facial challenge. "A facial challenge to the constitutional validity of a statute . . . considers only the text of the measure itself, not its application to the particular *circumstances* of an individual." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) The majority rejects Hatch's commerce clause facial challenge because the statute, as applied to Hatch's conduct in California sending harmful matter to California minors, does not unduly

burden protected interstate commerce. An as-applied analysis is not a facial analysis. The majority rejects Hatch's First Amendment facial challenge because the statute, as applied to Hatch's conduct in California sending harmful matter to California minors with the requisite intent, does not infringe on protected speech. Again, an as-applied analysis is not a facial analysis.

For the reasons I discuss below, I believe section 288.2, subdivision (b)'s " ' "provisions inevitably pose a present total and fatal conflict with [two] applicable constitutional prohibitions" ' " (*Tobe v. City of Santa Ana, supra*, 9 Cal.4th at p. 1084): the dormant aspect of the commerce clause and the First Amendment. Accordingly, I would sustain Hatch's facial challenges to the constitutionality of section 288.2, subdivision (b). Further, I would hold that as a matter of statutory construction, section 288.2, subdivision (a) does not prohibit distribution of harmful matter to minors over the Internet.

## I

## THE CONSTITUTIONAL ISSUES

Hatch argues section 288.2, subdivision (b) is facially invalid under article I, section 8 of the United States Constitution (the commerce clause), and section 288.2, subdivisions (a) and (b) are facially invalid under the First and Fifth Amendments to the United States Constitution.

Section 288.2 provides in part that:

"(a) Every person who, with knowledge that a person is a minor, or who fails to exercise reasonable care in ascertaining the true age of a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by any means . . . any harmful matter, as defined in Section 313, to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent or for the purpose of seducing a minor, is guilty of a public offense . . . . [¶] . . . [¶]

"(b) Every person who, with knowledge that a person is a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by electronic mail, the Internet . . . or a commercial online service, any harmful matter, as defined in Section 313, to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent, or for the purpose of seducing a minor, is guilty of a public offense . . . ."

Section 313 provides in part that: "(a) 'Harmful matter' means matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors."

## A. Section 288.2, Subdivision (b) and the Commerce Clause

I first evaluate section 288.2, subdivision (b) under the commerce clause. I begin with an overview of the applicable principles and then examine other courts' application of those principles to analogous sister state statutes.

### 1. General Principles

The commerce clause has two aspects: it is an affirmative grant of power to the federal government to regulate interstate commerce, and it restricts the power of states to regulate interstate commerce. (*Pacific Merchant Shipping Assn. v. Voss* (1995) 12 Cal.4th 503, 514-515 [48 Cal.Rptr.2d 582, 907 P.2d 430].) The state restriction aspect is commonly referred to as the dormant Commerce Clause (see *Barclays Bank PLC v. Franchise Tax Bd. of Cal.* (1994) 512 U.S. 298, 310, fn. 9 [114 S.Ct. 2268, 2276, 129 L.Ed.2d 244]). State laws that impose discriminatory restrictions on interstate commerce are virtually per se invalid.[2] State laws that regulate activity requiring a national regulatory scheme and impose multiple inconsistent burdens on interstate commerce may also be invalid.[3] (See, e.g., *CTS Corp. v. Dynamics Corp. of America* (1987) 481 U.S. 69, 88-89 [107 S.Ct. 1637, 1649-1650, 95 L.Ed.2d 67]; *Southern Pacific Co. v. Arizona* (1945) 325 U.S. 761, 767 [65 S.Ct. 1515, 1519, 89 L.Ed. 1915]; *Bibb v. Navajo Freight Lines* (1959) 359 U.S. 520, 529 [79 S.Ct. 962, 967-968, 3 L.Ed.2d 1003].) State laws that regulate activities outside the state's borders may be invalid; a state may not export its domestic policies into other states and therefore may not enact laws regulating activities occurring outside its borders. (*Edgar v. MITE Corp.*

---

[2]In the commerce clause context the term "discrimination" means differential treatment of in-state and out-of-state economic interests that benefits the in-state interests and burdens the out-of-state interests. (*Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.* (1994) 511 U.S. 93, 99 [114 S.Ct. 1345, 1349-1350, 128 L.Ed.2d 13].) The discrimination may take any of three forms: first, the statute may facially discriminate against interstate or foreign commerce; second, it may be facially neutral but have a discriminatory purpose; third, it may be facially neutral but have a discriminatory effect. (*SDDS, Inc. v. State of S.D.* (8th Cir. 1995) 47 F.3d 263, 267.) Section 288.2, subdivision (b) is not a discriminatory statute.

[3]This aspect of the commerce clause is applied regardless of the legislative intent of the state statute. (*Healy v. The Beer Institute* (1989) 491 U.S. 324, 333, fn. 9 [109 S.Ct. 2491, 2498, 105 L.Ed.2d 275].)

(1982) 457 U.S. 624, 641-643 [102 S.Ct. 2629, 2640-2641, 73 L.Ed.2d 269]; *Baldwin v. G. A. F. Seelig* (1935) 294 U.S. 511, 521 [55 S.Ct. 497, 499-500, 79 L.Ed. 1032, 101 A.L.R. 55].) Finally, a state law that is not invalid under the foregoing tests may be invalid under the balancing test articulated in *Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137 [90 S.Ct. 844, 25 L.Ed.2d 174]. (*Campeau Corp. v. Federated Dept. Stores* (S.D. Ohio 1988) 679 F.Supp. 735, 738-739 [court evaluates statute under *Pike* test only if statute first passes tests that prohibit discriminatory statutes and statutes imposing inconsistent burdens].) Under *Pike*, the court balances the burden placed on interstate commerce by the state law against the local benefit derived from the state law (*Pike, supra,* at p. 142 [90 S.Ct. at p. 847]) and the state law is invalid if the burden on interstate commerce is clearly excessive compared to the putative local benefit. (*Ibid.*)

## 2. *The Pataki Decision*

In *American Libraries Ass'n v. Pataki* (S.D.N.Y. 1997) 969 F.Supp. 160 (*Pataki*), the court evaluated a New York statute similar to section 288.2, subdivision (b) that criminalized knowingly communicating harmful matter to minors over the Internet.[4] The *Pataki* court evaluated the nature of the Internet, noting the Internet is a global, decentralized and borderless communications medium in which participants communicate in a variety of ways, including one-to-one messaging (such as e-mail), one-to-many messaging (such as "listserv" and "mail exploders"), distributed message databases (such as "USENET newsgroups") and remote information retrieval (such as Web sites). (969 F.Supp. at pp. 164-165 & 167.) The Internet permits participants to communicate anonymously by using pseudonyms without disclosing either the age or geographic location of the participants. (*Ibid.*)

*Pataki* first concluded that because the New York law regulated a mode of communications used as a conduit for interstate commerce, it was subject to Commerce Clause scrutiny. It rejected the state's argument that because the law was directed at conduct that was not commerce, the commerce clause was inapplicable. It reasoned that the dormant commerce clause has been

---

[4]New York Penal Law section 235.21, subdivision 3 made it a crime for an individual: "Knowing the character and content of the communication which, in whole or in part, depicts actual or simulated nudity, sexual conduct or sado-masochistic abuse, and which is harmful to minors, [to] intentionally use[] any computer communication system allowing the input, output, examination or transfer, of computer data or computer programs from one computer to another, to initiate or engage in such communication with a person who is a minor." The New York statute defined harmful matter in terms similar to the California definition (compare N.Y. Pen. Law § 235.20, subd. 6 with Pen. Code, § 313) and provided various affirmative defenses that have counterparts under California law. (Compare N.Y. Pen. Law § 235.15 with Pen. Code, § 288.2, subds. (c)-(e).)

applied to laws that regulated activities undertaken without a profit motive (see *Edwards v. California* (1941) 314 U.S. 160, 172, fn. 1 [62 S.Ct. 164, 166, 86 L.Ed. 119] [law prohibiting transportation of indigents into California invalid under dormant commerce clause and it is "immaterial whether or not the transportation is commercial in character"]) and that the concept of commerce is given broad meaning by the courts. (See *Camps Newfound/ Owatonna, Inc. v. Town of Harrison* (1997) 520 U.S. 564 [117 S.Ct. 1590, 137 L.Ed.2d 852].) Moreover, because the Internet has become an important conduit for commercial activity, regulations affecting it are subject to commerce clause scrutiny.[5] (*Pataki, supra,* 969 F.Supp. at pp. 169-173.)

*Pataki* then evaluated the New York statute under commerce clause principles and concluded it was per se invalid. First, the statute purported to regulate conduct occurring outside New York's borders. Second, the nature of the Internet requires uniform regulation and Internet users would be threatened by multiple inconsistent burdens were each state to impose its separate Internet regulations. The *Pataki* court also concluded that, under the *Pike* test, the statute's burdens on interstate commerce outweighed the putative local benefits of the statute.[6]

The commerce clause's ban on state regulations that have the effect of exporting the state's domestic policies into other states (*Edgar v. MITE Corp., supra,* 457 U.S. 624, 642-643 [102 S.Ct. 2629, 2640-2641]; *Healy v. The Beer Institute, supra,* 491 U.S. 324, 336 [109 S.Ct. 2491, 2499]) convinced the *Pataki* court that the New York statute was per se invalid. The *Pataki* court reasoned that: "The *Edgar/Healy* extraterritoriality analysis rests on the premise that the Commerce Clause has two aspects: it subordinates

---

[5]The *Pataki* court also rejected the state's claim that the law only affected intrastate activities. It reasoned that the language of the statute and its legislative history showed it was not limited to intrastate conduct, and instead was designed and intended to apply to any communication, whether intrastate or interstate, over which New York had the capacity to exercise criminal jurisdiction. (*Pataki, supra,* 969 F.Supp. at pp. 164-165 and 167.) The majority here asserts that section 288.2, subdivision (b) applies only to fully intrastate communications. However, there is nothing in the statute or its legislative history that supports a limitation of application from the full capacity to exercise criminal jurisdiction. (See discussion, *post,* at pp. 214-215.)

[6]The principal basis for this conclusion was that although protecting minors from harmful matter was a compelling state interest, the local benefits from the statute were de minimis because (1) the law had no effect on communications originating outside the United States; (2) the law had little effect on persons outside of New York who were *not readily subject to* prosecution in New York; (3) other existing laws permitted prosecution of persons engaged in child pornography or child molestation; and (4) the testimony established that only a single person had been prosecuted under the law who would not have been prosecutable under other existing laws. Against this minimal benefit the court found significant burdens, both in the form of impinging on the sovereignty of sister jurisdictions, and in the form of chilling protected speech. (*Pataki, supra,* 969 F.Supp. at pp. 177-181.)

each state's authority over interstate commerce to the federal power of regulation (a vertical limitation), and it embodies a principal of comity that mandates that one state not expand its regulatory powers in a manner that encroaches upon the sovereignty of its fellow states (a horizontal limitation)." (969 F.Supp. at pp. 175-176.)

*Pataki* concluded that the nature of the Internet "makes it impossible to restrict the effects of the [law] to conduct occurring within New York" (*Pataki, supra,* 969 F.Supp. at p. 177); an Internet user may not intend his messages to be accessible in New York but cannot prevent New Yorkers from accessing his messages or prevent messages directed to recipients in other states from passing through New York computers. "Thus, conduct that may be legal in the state in which the user acts can subject the user to prosecution in New York and thus subordinate the user's home state's policy—perhaps favoring freedom of expression over a more protective stance—to New York's local concerns." (*Ibid.*) *Pataki* held that New York's regulation of the Internet had the effect of projecting New York's laws into other states and was per se invalid under the *Edgar/Healy* extraterritoriality analysis of the commerce clause. (*Ibid.*)

*Pataki* further concluded that the nature of the Internet requires a national uniform regulation because Internet users would be threatened by multiple inconsistent burdens if each state implemented its own Internet regulations. *Pataki* cited several cases in which laws purporting to regulate only intrastate matters of local concern were struck down under the commerce clause because they affected a form " 'of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority.' [(Quoting *Southern Pacific Co. v. Arizona, supra,* 325 U.S. at p. 767 [65 S.Ct. at p. 1519].)]" (*Pataki, supra,* 969 F.Supp. at pp. 181-182.) *Pataki* reasoned that the Internet, like the rail and highway regulations at issue in *Southern Pacific Co.* and *Bibb v. Navajo Freight Lines, supra,* 359 U.S. 520, would be severely burdened if users were "lost in a welter of inconsistent laws, imposed by different states with different priorities," and concluded the Internet "requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations." (*Pataki, supra,* at p. 182.) The potential for multiple inconsistent burdens was increased by the fact that the New York law banned harmful matter using the *Miller v. California* (1973) 413 U.S. 15 [93 S.Ct. 2607, 37 L.Ed.2d 419] (*Miller*) standard, which incorporates a patently offensive to prevailing standards in the community test. *Pataki* noted that because there is no single prevailing community standard in the United States, "even were all 50 states to enact laws that were verbatim copies of the New York Act, Internet users would still be subject to discordant

responsibilities"; matter not deemed harmful in the state from which it was sent could be deemed harmful in states in which it was received. (*Pataki, supra,* at pp. 182-183.) Because an Internet user cannot know the geographic location of the message recipient or foreclose access to the message, he or she would have to (1) comply with the most stringent standard, or (2) forgo communicating matter protected in the user's state, or (3) risk prosecution based on the geographic fortuity of the unknown recipient. Based on this analysis *Pataki* concluded: "Further development of the Internet requires that users be able to predict the results of their Internet use with some degree of assurance. Haphazard and uncoordinated state regulation can only frustrate the growth of cyberspace. The need for uniformity in this unique sphere of commerce requires that New York's law be stricken as a violation of the Commerce Clause." (*Id.* at p. 183.)

The *Pataki* commerce clause analysis was followed in *Cyberspace, Communications, Inc. v. Engler* (E.D.Mich. 1999) 55 F.Supp.2d 737 (*Engler*) and in *American Civil Liberties Union v. Johnson* (10th Cir. 1999) 194 F.3d 1149 (*Johnson*). *Engler* held unconstitutional under the commerce clause a Michigan statute that criminalized Internet communications to minors of sexually explicit matter harmful to minors (Mich. Comp. Laws § 722.671 [Mich. Stat. Ann. § 25.254]). The *Engler* court noted the extraterritorial effect of the statute and found it a per se violation of the commerce clause. (*Engler, supra,* at p. 751.) The court also found the statute unconstitutional under the *Pike* balancing test. (*Ibid.*) *Johnson* held unconstitutional under the commerce clause a New Mexico statute that criminalized dissemination by computer of harmful matter to a minor. (N.M. Stat. Ann. § 30-37-3.2, subd. A.) The *Johnson* court noted that the statute "represents an attempt to regulate interstate conduct occurring outside New Mexico's borders, and is accordingly a per se violation of the Commerce Clause." (*Johnson, supra,* at p. 1161, fn. omitted.) The *Johnson* court also found the statute unconstitutional under the *Pike* balancing test and the need for uniform regulation test. (*Id.* at pp. 1161-1162; see also *People v. Barrows* (1998) 177 Misc.2d 712 [677 N.Y.S.2d 672, 685] (*Barrows II*); but see *People v. Foley* (1999) 257 A.D.2d 243 [692 N.Y.S.2d 248, 256] (*Foley*).)

### 3. *Analysis*

The actus reus of a section 288.2, subdivision (b) violation is the act of distributing harmful matter over the Internet to a known minor regardless of whether the sender is physically in California at the time of the transmission. Moreover, although the sender must have specific intents and purposes and know the recipient is a minor, he need not know the minor he intends to seduce is in California. Because the statute regulates conduct in other states and burdens the use of a conduit of interstate commerce, its constitutionality

must be evaluated under the commerce clause. (*Pataki, supra,* 969 F.Supp. at pp. 169-174.) The majority opinion does not dispute the Internet is a conduit of interstate commerce or that section 288.2, subdivision (b) must survive Commerce Clause scrutiny; however, the majority asserts the statute does not seek to regulate activity outside California. Neither the text nor the legislative history of the statute supports the majority's position. On its face, the statutory violation occurs once the harmful matter is transmitted and contains no limitation to California-domiciled transmitters or recipients. Moreover, the legislative history shows that one of the evils prompting the enactment of section 288.2, subdivision (b) was that sexual predators in other states were using the Internet to lure children to cross state lines to engage in sexual liaisons. (See Sen. Com. on Pub. Safety, Analysis of Assem. Bill No. 181 (1997-1998 Reg. Sess.) as amended Apr. 8, 1997, par. 2, at <http://www.leginfo.ca.gov> [as of Mar. 27, 2000].) Thus, the majority's claim that the statute regulates only intrastate conduct is not persuasive.

Section 288.2, subdivision (b) suffers from the same commerce clause infirmities as the New York statute considered in *Pataki.* First, the statute has the practical effect of exporting California's domestic policies into other states, which is impermissible under *Edgar v. MITE Corp., supra,* 457 U.S. 624 and *Healy v. The Beer Institute, supra,* 491 U.S. 324. Conduct lawful in a sister state may, because of the nature of the Internet, subject a sender to criminal liability in California even if the sender did not intend his message to be read in California; he can neither prevent Californians from accessing his messages nor prevent messages directed to recipients in other states from passing through California computers. For example, in many states a 19-year-old male may have sexual relations with a 16-year-old female without violating any law, and there would appear to be no impediment to his use of e-mail to send salacious matter intending to seduce even though he knew her to be 16 years old.[7] However, if unbeknownst to the sender a female to whom he sent the matter was (1) a California domiciliary or (2) a casual

---

[7]The hypothetical 19-year-old to 16-year-old e-mail would apparently violate no Alabama law. (See Ala. Code § 13A-6-110.) Moreover, a recent comprehensive survey of the laws in varying states demonstrates the diversity of laws throughout the country regarding the age of consent. (See Phipps, *Children, Adults, Sex and the Criminal Law: In Search of Reason* (1997) 22 Seton Hall Legis.J. 1.) There is no criminal liability for sexual conduct with children age14 or older in Hawaii or for sexual conduct with children age 15 or older in Colorado. (*Id.* at p. 138, fn. 243.) Many states distinguish between "penetration" offenses and "sexual contact" offenses. For the so-called penetration offenses, only 12 states set 18 years old as the threshold age for consensual activity. For the so-called sexual contact offenses, only seven states set 18 years old as the threshold age for consensual activity. In the remaining states, consensual sexual contact is permitted between an adult and child who is 17 years old (four states), or 16 years old (22 states), or 15 years old (four states) or 14 years old (nine states) or even 13 years old (four states). (*Id.* at pp. 60-62.) For example, it appears that if Hatch

visitor to California who used a remote retrieval method to open the offending transmission at a California cybercafe, the sender's conduct, lawful under the domestic policies of his home state, subjects him to criminal prosecution in California. I agree with *Pataki*'s observation, modified to fit the California context, that under section 288.2, subdivision (b), "conduct that may be legal in the state in which the user acts can subject the user to prosecution in [California] and thus subordinate the user's home state's policy—perhaps favoring freedom of expression over a more protective stance—to [California's] local concerns." (*Pataki, supra,* 969 F.Supp. at p. 177.) This extraterritoriality aspect of section 288.2, subdivision (b) makes it per se invalid under the *Edgar/Healy* extraterritoriality analysis of the commerce clause.

The majority concludes that section 288.2, subdivision (b) is not invalid under the *Edgar/Healy* extraterritoriality analysis because in this case all conduct was between California domiciliaries and occurred within California; therefore the application of the statute to Hatch does not project California's laws into other states. Although the majority does not cite *Barrows II* on this point, the *Barrows II* court rejected a Commerce Clause challenge to a conviction for luring a minor to engage in sexual activity by disseminating harmful matter over the Internet because the defendant's conduct was within the State of New York. Although *Barrows II* peremptorily stated that the problems of extraterritoriality and preemption became mooted by conduct within New York (*Barrows II, supra,* 677 N.Y.S.2d at pp. 685-686), I am not persuaded this statement should be followed. First, because the same conviction was overturned on First Amendment grounds (*id.* at p. 686), the *Barrows II* discussion of the commerce clause was dicta. Second, *Barrows II* made no effort to evaluate the difference between a facial challenge and an as-applied challenge to a statute.

The majority here relies on *Foley, supra,* 692 N.Y.S.2d 248, in which the court rejected a commerce clause challenge to convictions for luring a minor to engage in sexual activity by disseminating harmful matter over the Internet regardless of whether the conduct occurred in the State of New York. *Foley* considered a commerce clause challenge to the same New York Penal Law section 235.22 that was challenged in *Barrows II*. However, *Foley* considered only the discrimination and *Pike* balancing aspects of the dormant commerce clause. Because *Foley* did not consider the extraterritoriality

---

engaged in consensual sexual contact with "Lisa" not involving penetration, he would have committed no crime in New Hampshire (N.H. Rev. Stat. Ann. § 632-A:3) or Tennessee (Tenn. Code Ann. § 39-13-504), and some forms of sexual contact between Hatch and Lisa would not be criminal in Virginia. (Va. Code Ann. §§ 18.2-67.3 & 18.2-63.)

or multiple inconsistent burden aspects of the dormant Commerce Clause I do not find its analysis or result persuasive. (See *Engler, supra,* 55 F.Supp.2d at pp. 750, 751; *Johnson, supra,* 194 F.3d at pp. 1160-1162.)

In my view the majority makes the same Commerce Clause analysis error as does *Barrows II. Barrows II* did not distinguish between a facial and an as-applied challenge to the statute. *Barrows II* was apparently unaware of the distinction and ignored it. The majority here recognizes the distinction and ignores it. Inexplicably, the majority considers Hatch's facial challenge to section 288.2, subdivision (b) by referring to the facts of Hatch's case. However, a facial challenge to the constitutional validity of a statute considers only the text of the statute, not its application to the particular circumstances of a particular defendant. (*Tobe v. City of Santa Ana, supra,* 9 Cal.4th 1069, 1084.) Thus, in *Morgan v. Virginia* (1946) 328 U.S. 373 [66 S.Ct. 1050, 90 L.Ed. 1317, 165 A.L.R. 574], a local passenger on a bus was convicted of violating state penal statutes relating to segregation of passengers of public carriers according to color. Although the statute was susceptible to an interpretation that it applied only to intrastate passengers, the court nevertheless concluded the statute was invalid under the commerce clause because on its face it was susceptible to application to both intrastate and interstate passengers. (*Id.* at pp. 382-386 [66 S.Ct. at pp. 1056-1058].) Thus, a statute may facially violate the Commerce Clause even though a particular application of the statute might not. The majority has simply made an as-applied analysis of the commerce clause and thereby missed the point of extraterritoriality set forth in *Pataki, Engler* and *Johnson.*

Furthermore, under section 288.2, subdivision (b), users of the Internet are threatened by multiple inconsistent burdens as each state implements separate Internet statutes; the nature of the Internet requires a national uniform regulation.[8] Absent uniform national regulation, users will be "lost in

---

[8]The potential for multiple inconsistent laws has already emerged. In Alabama, it is a crime to use the Internet to seduce only when the user is 19 years or older and the recipient is under age 16. (See Ala. Code § 13A-6-110.) In Florida, the crime is committed only if the child resides or is believed by the perpetrator to reside in Florida. (Fla. Stat. Ann. § 847.0135.) In two states, furnishing indecent matter over the Internet to a person who the sender knew or should have known was a minor violates the statute (Ga. Code Ann. § 16-12-100.1; N.M. Stat. Ann. § 30-37-3.2, subd. A), although these statutes appear vulnerable under *Reno v. American Civil Liberties Union* (1997) 521 U.S. 844 [117 S.Ct. 2329, 138 L.Ed.2d 874] (*Reno*). In Indiana, it is a crime to use the Internet to solicit sexual conduct with a child under the age of 14. (Ind. Code Ann. § 35-42-4-6.) In Virginia, the law bans use of the Internet to promote, produce or market "sexually explicit visual material" involving children under age 18 or to entice such children to perform in or be a subject of sexually explicit visual material. (Va. Code Ann. § 18.2-374.3.)

a welter of inconsistent laws, imposed by different states with different priorities" (*Pataki, supra,* 969 F.Supp. at p. 182) and users will be unable to reasonably determine their obligations. For example, section 288.2, subdivision (b) defines the type of communications outlawed by reference to the standards articulated in *Miller, supra,* 413 U.S. 15 and incorporates "contemporary statewide standards" to determine whether the matter appeals to prurient interests and is patently offensive (§ 313). However, there is no single prevailing community standard in the United States, which therefore subjects Internet users to "discordant responsibilities": matter not deemed harmful in the state from which it was sent could be deemed harmful under California standards. (*Pataki, supra,* at pp. 182-183.) Because an Internet sender cannot know the geographic location of the recipient or prevent access to the message, the sender would have to (1) comply with the California's standards, or (2) forgo communicating matter protected in the user's state but not in California, or (3) risk prosecution based on the geographic fortuity that his recipient might be in California. The potential for inconsistent obligations is exacerbated by the age-of-consent differences among the states. Different states may conclude that a person capable of consent at an age younger than that designated in California should be entitled to view matter that would be deemed harmful under California's concept of minority. (See *Johnson, supra,* 194 F.3d at p. 1162.)

The majority seeks to distinguish *Pataki* on two grounds: first, the statute in *Pataki* does not contain an intent-to-seduce requirement, and second, the California statute is limited to Internet transmissions sent and received in California. Although the majority repeatedly describes the first distinction as crucial, it does not explain why it is crucial or the effect it has on the extraterritorial or multiple inconsistent burden effect of section 288.2, subdivision (b). The second distinction, which places an unsupported narrow interpretation on the scope of section 288.2, subdivision (b), is a reflection of an as-applied rather than a facial analysis and is inconsistent with the legislative history of the statute. (See Sen. Com. on Pub. Safety, Analysis of Assem. Bill No. 181, *supra,* at par. 2.) Attempts to narrow the scope of similar statutes have been rejected. (See *Johnson, supra,* 194 F.3d 1149, 1161; *Pataki, supra,* 969 F.Supp. at pp. 164-165 & 167.)

Although the protection of minors from harmful matter is an important state interest, the nature of the Internet compels the conclusion that California's statutory attempt in section 288.2, subdivision (b) to criminalize a certain category of Internet transmissions is unconstitutional under the

commerce clause because of its extraterritorial effect and the need for uniform national regulation.[9]

## B. *Section 288.2, Subdivision (b) and the First Amendment*

Hatch asserts section 288.2, subdivisions (a) and (b), to the extent they facially apply to Internet communications, are invalid for vagueness and overbreadth under the First Amendment to the United States Constitution.

### 1. *General Principles Applicable to Section 288.2, Subdivision (b)*

Section 288.2, subdivision (b) is a content-based proscription against speech; it imposes criminal liability on a person who, with the requisite intent and purpose, sends an Internet communication the content of which is harmful to minors. (Cf. *Berry v. City of Santa Barbara* (1995) 40 Cal.App.4th 1075, 1084 [47 Cal.Rptr.2d 661] [statute that regulates harmful matter under § 313 is a content-based regulation].) To determine whether a regulation is content-based, the "principle inquiry . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. [Citation.] The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. [Citation.]" (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 791 [109 S.Ct. 2746, 2754, 105 L.Ed.2d 661].) The People argue section 288.2, subdivision (b) is not directed at the content of the speech but, because it seeks to prevent the seduction of minors, is instead directed at the secondary effects of the speech, which subjects section 288.2, subdivision (b) to a lesser level of scrutiny. (See *Renton v. Playtime Theatres, Inc.* (1986) 475 U.S. 41, 47-50 [106 S.Ct. 925, 928-930, 89 L.Ed.2d 29].) However, a law that proscribes speech to prevent certain reactions from the listener is a law targeting the direct impact of the speech rather than its secondary effects (*Boos v. Barry* (1988) 485 U.S. 312, 319-321 [108 S.Ct. 1157, 1162-1164, 99 L.Ed.2d 333]) and is a content-based regulation subject to the highest level of scrutiny. (See *Crawford v. Lungren* (9th Cir. 1996) 96 F.3d 380, 384-385; *Sebago, Inc. v. City of Alameda* (1989) 211 Cal.App.3d 1372, 1384 [259 Cal.Rptr. 918].) Section 288.2, subdivision (b) is designed to prevent the listener from becoming seduced by speech, and is therefore a content-based proscription. The majority characterizes the activity prohibited by section 288.2, subdivisions (a) and (b) as conduct rather than speech, a conclusion supported by no cited authority. As a result, it is not difficult for

---

[9] It is unnecessary to evaluate section 288.2, subdivision (b) under the *Pike* burden-benefit test.

the majority to conclude that section 288.2, subdivision (b) is not subject to facial challenge under the First Amendment.

A content-based regulation is presumptively invalid (*R. A. V. v. St. Paul* (1992) 505 U.S. 377, 382 [112 S.Ct. 2538, 2542, 120 L.Ed.2d 305]; *City of Fresno v. Press Communications, Inc.* (1994) 31 Cal.App.4th 32, 40 [36 Cal.Rptr.2d 456]), and is subject to strict scrutiny review: the people must demonstrate the regulation is necessary to serve a compelling state interest and is narrowly tailored to achieve that interest. (*Sebago, Inc. v. City of Alameda, supra,* 211 Cal.App.3d at p. 1382.)

My analysis is guided by a key consideration: the Internet communications made criminal under section 288.2, subdivision (b) enjoy First Amendment protection if transmitted to adults.[10] (*Berry v. City of San Barbara, supra,* 40 Cal.App.4th at pp. 1083-1085.) Because the majority applies an as-applied analysis rather than a facial analysis, it does not address the fundamental First Amendment issue raised by Hatch. As the court explained in *Sable Communications of Cal., Inc. v. FCC* (1989) 492 U.S. 115, 126 [109 S.Ct. 2829, 2836, 106 L.Ed.2d 93]: "Sexual expression which is indecent but not obscene is protected by the First Amendment . . . . The Government may . . . regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest. We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors. This interest extends to shielding minors from the influence of literature that is not obscene by adult standards. [Citations.] The Government may serve this legitimate interest, but to withstand constitutional scrutiny, 'it must do so by narrowly drawn regulations designed to serve those interests without

---

[10]Section 288.2, subdivision (b) defines the prohibited "harmful matter" as matter defined by section 313. Matter deemed harmful to minors under section 313 is not necessarily obscene when viewed by adults. (*Berry v. City of Santa Barbara, supra,* 40 Cal.App.4th at pp. 1081-1083.) The People argue that if we conclude section 288.2, subdivision (b) is facially overbroad under the First Amendment because the banned content is defined by reference to section 313's "harmful to minors" standard, we can uphold its constitutionality by construing it to apply only when the transmitter sends obscene matter because obscene matter enjoys no First Amendment protection. Although this construction eliminates much of the overbreadth problem, and I am cognizant that when possible we construe a statute to make it constitutional (*Public Citizen v. Department of Justice* (1989) 491 U.S. 440, 465-466 [109 S.Ct. 2558, 2572-2573, 105 L.Ed.2d 377]), a court may not under the guise of interpretation wholly rewrite a law to preserve its constitutionality. (*City of Carmel-by-the-Sea v. Young* (1970) 2 Cal.3d 259, 272 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313].) Matter indecent to minors but not adults is defined in section 313, and matter obscene to all persons is defined in section 311. To adopt the People's argument requires the excise from section 288.2, subdivision (b) of the reference to section 313 and insertion of section 311 in its place, which is a legislative rather than judicial function.

unnecessarily interfering with First Amendment freedoms. [Citations.]' [Citation.] It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends."

Under *Sable* the California Legislature has the constitutional power to enact laws designed to keep harmful matter from minors, even though the same matter judged by adult standards is entitled to First Amendment protection. (*Kash Enterprises, Inc. v. City of Los Angeles* (1977) 19 Cal.3d 294, 302 [138 Cal.Rptr. 53, 562 P.2d 1302]; *Sebago, Inc. v. City of Alameda, supra,* 211 Cal.App.3d at p. 1381.) However, a valid law must be narrowly drawn to serve that interest without unnecessarily interfering with First Amendment freedoms.

### 2. Section 288.2, Subdivision (b) Is Invalid for Overbreadth

Application of strict scrutiny review involves a two part analysis: does the restriction on speech serve a compelling state interest; and is it narrowly drawn to achieve only that interest. States have a compelling interest in protecting the welfare of minors and in preventing minors from gaining access to matter deemed harmful as to them. (*Sable Communications of Cal., Inc. v. FCC, supra,* 492 U.S. 115, 126 [109 S.Ct. 2829, 2836-2837]; *FCC v. Pacifica Foundation* (1978) 438 U.S. 726, 749-750 [98 S.Ct. 3026, 3040-3041, 57 L.Ed.2d 1073].) I assume for purposes of analysis that section 288.2, subdivision (b)'s goal of protecting minors from exposure to harmful matter is a compelling state interest.

A law is narrowly drawn only if it contains the "least restrictive means to further the articulated interest." (*Sable Communications of Cal., Inc. v. FCC, supra,* 492 U.S. at p. 126 [109 S.Ct. at p. 2836].) The regulation must "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy. [Citation.]" (*Frisby v. Schultz* (1988) 487 U.S. 474, 485 [108 S.Ct. 2495, 2503, 101 L.Ed.2d 420].) A statute will be invalid for overbreadth when on its face it criminalizes a substantial amount of protected, as well as unprotected, speech (*People v. Antoine* (1996) 48 Cal.App.4th 489, 495 [56 Cal.Rptr.2d 530]) and therefore chills First Amendment protected speech. (*Bailey v. City of National City* (1991) 226 Cal.App.3d 1319, 1331 [277 Cal.Rptr. 427]; *New York v. Ferber* (1982) 458 U.S. 747, 768-769 [102 S.Ct. 3348, 3360-3361, 73 L.Ed.2d 1113]; *Broadrick v. Oklahoma* (1973) 413 U.S. 601, 615 [93 S.Ct. 2908, 2918, 37 L.Ed.2d 830] ["[O]verbreadth

. . . must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."].)[11]

I am convinced by the reasoning of *Reno, supra,* 521 U.S. 844, *Engler, supra,* 55 F.Supp.2d 737, *Barrows II, supra,* 677 N.Y.S.2d 672, and *Johnson, supra,* 194 F.3d 1149 that section 288.2 subdivision (b) is overbroad because it chills Internet users from engaging in constitutionally protected speech by threatening them with criminal sanctions. *Reno* evaluated the federal Communications Decency Act of 1996 (CDA), which criminalized knowingly communicating to persons under the age of 18 years "indecent" or "patently offensive" speech. (*Reno, supra,* at pp. 859-861 [117 S.Ct. at p. 2338].) *Reno* recognized that although the government has an interest in protecting children from harmful matter, "that interest does not justify an unnecessarily broad suppression of speech addressed to adults"; *Reno* reaffirmed that " '[r]egardless of the strength of the government's interest' in protecting children, '[t]he level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox.' [(Quoting *Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 74-75 [103 S.Ct. 2875, 2884-2885, 77 L.Ed.2d 469].)]" (*Reno, supra,* at p. 875 [117 S.Ct. at p. 2346].) *Reno* concluded that because of the nature of the Internet, substantial amounts of protected speech could be subjected to criminal prosecution under the CDA and portions of the CDA were therefore invalid for overbreadth. (*Id.* at pp. 877-879 [117 S.Ct. at pp. 2347-2348].) *Reno* expressed two principal reasons for concluding the CDA was overbroad. First, the CDA banned matter that was "indecent" or "patently offensive" without incorporating the additional elements under *Miller* that the matter "appeal to the prurient interest" and "lack[] serious literary, artistic, political or scientific value"; the CDA therefore facially banned communications of large amounts of protected matter with serious educational or other value. Second, by defining the banned content based on whether it offended "community standards," a sender incurs criminal liability under the CDA for a transmission of protected speech that his home community deemed neither indecent nor patently offensive if the community in which it was received "thought otherwise." (*Ibid.*)

The majority concludes that *Reno* is not controlling here because, unlike the CDA, section 288.2, subdivision (b)'s definition of "harmful matter" is

---

[11]Hatch has standing to raise this challenge even though his speech would be punishable without offending the First Amendment. Although constitutional rights are generally said to be personal, a well-established exception is found in the overbreadth doctrine associated with First Amendment jurisprudence. (*Wurtz v. Risley* (9th Cir. 1983) 719 F.2d 1438, 1440.) Under this doctrine, litigants may challenge a statute not because their own rights of free expression are violated, but because the existence of an overbroad statute may cause others not before the court to refrain from constitutionally protected expression. (*Broadrick v. Oklahoma, supra,* 413 U.S. at p. 612 [93 S.Ct. at pp. 2915-2916]; *Wurtz v. Risley, supra,* 719 F.2d at p. 1440.)

consistent with the *Miller* test and requires the sender have the specific intent to "arous[e], appeal[] to, or gratify[] the lust or passions or sexual desires" of the sender or the minor for the purpose of seducing the minor. Even with these limiting textual refinements, the statute is substantively indistinguishable from the New York statute held unconstitutional under the First Amendment in *Barrows II.*

In *Barrows II*, the court examined a New York statute that criminalized communicating matter "harmful to minors" sent to "importune[], invite[] or induce[] a minor" to engage in sexual conduct with or for the defendant's benefit. (*Barrows II, supra,* 677 N.Y.S.2d at pp. 679-680.) Like section 288.2, subdivision (b), the New York statute (1) defined the prohibited "harmful to minors" content of the transmission using the *Miller* standards (compare N.Y. Pen. Law § 235.20, subd. 6 with Pen. Code, § 313) and (2) required the matter be sent with the intent to induce the minor to engage in sexual conduct.

*Barrows II* concluded that under *Reno* the New York statute was invalid for vagueness and overbreadth. (*Barrows II, supra,* 677 N.Y.S.2d at p. 686.) *Barrows II* reasoned that although incorporation of the *Miller* standards into the New York statute eliminated one of *Reno*'s overbreadth concerns, a second basis of *Reno*'s overbreadth analysis remained applicable: the borderless nature of the Internet prohibited a clear and predictable definition of what content would be "patently offensive to prevailing standards." (*Id.* at pp. 682-683.) *Barrows II* reasoned: "The international, geographically-borderless nature of the Internet's reach, regardless of the speaker's intent, was a major factor in the [*Reno* court's] finding that the CDA is facially unconstitutional. This finding applies equally to the New York statute which, though not as vague as the CDA in light of the definition of what is 'harmful to children[,'] does suffer from the same imprecision and overbreadth in failing to provide a clear and predictable definition of what transmissions will be deemed 'patently offensive to prevailing standards' of a universal audience. Were it possible to confine the use of the Internet within the State of New York, perhaps the statute would be enforceable, but that is neither possible . . . nor, in light of the potential of the Internet, is it desirable to so restrict such communication. The inevitable dilemma faced by the Internet user who wishes to transmit ideas which are sexual in nature or which contain even simulated nudity is whether such expressions will offend the standards of any community within the vast range of transmission as to what is 'suitable' for children. . . ." (677 N.Y.S.2d at p. 683.)

*Barrows II* also noted that *Reno* rejected the government's argument that the requirement of knowledge of the recipient's age insulates the innocent

adult from criminal prosecution. *Reno* recognized that most Internet communications are open to anyone and expressed concern of the possible heckler's veto by which an opponent of a protected message " 'might simply log on and inform the would-be discoursers' of the presence of a [minor], thereby chilling any further communication among adult participants [quoting *Reno, supra*, 521 U.S. at p. 880 [117 S.Ct. at p. 2349]]." (*Barrows II, supra*, 677 N.Y.S.2d at pp. 683-684.) The potential of the heckler's veto, together with the chilling effect of the penal aspect of the CDA, could " 'cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images' [(quoting *Reno, supra*, at p. 872 [117 S.Ct. at pp. 2344-2345])]." (*Barrows II, supra*, at p. 684.) These considerations convinced the *Barrows II* court that, although the goals of the statute were laudable, the statute was invalid for overbreadth because it chilled protected speech by threatening to attach criminal liability to persons engaged in protected speech. (*Id.* at p. 686.) The majority here seeks to avoid this aspect of *Barrows II* by limiting its analysis to Hatch's one-on-one-communications with Stacie and Lisa. Again, the narrow analysis of the majority results from its as-applied-to-Hatch review and ignores the substance of Hatch's First Amendment facial challenge to section 288.2, subdivision (b).

I am aware that the Appellate Division of the Supreme Court of New York in *Foley* reached a conclusion different from the conclusion of the Supreme Court of New York in *Barrows II* and that *Barrows II* may not reflect the current status of the constitutionality of New York Penal Law section 235.22, the Penal Law section challenged in both cases. However, I have referred at length to *Barrows II* not for its continued authority in New York on the constitutionality of New York Penal Law section 235.22, but for the cogency of its analysis. Although *Foley* is the opinion of the higher New York court, I find its analysis unpersuasive. The *Foley* court's analysis of the difficult First Amendment issues presented is conclusionary and even desultory. The *Foley* opinion describes the New York law as consisting of two prongs: the dissemination of harmful matter to minors and luring the minor to engage in sexual activity. (*Foley, supra*, 692 N.Y.S.2d at pp. 253, 254.) It then concludes without explanation that "[b]ecause of the two-pronged nature of the statute, communication between adults would not be chilled" even though it acknowledges there are applications of the statute that would make it overbroad. (*Id.* at p. 254.) Because I am unable to discern the rationale of the *Foley* opinion, I find it unhelpful in the analysis of the First Amendment issues.

In *Engler,* the court examined a Michigan statute (Mich. Comp. Laws § 722.671 [Mich. Stat. Ann. § 25.254]) that made criminal the use of computers or the Internet to disseminate sexually explicit matter to minors.

(*Engler, supra,* 55 F.Supp.2d at p. 740.) *Engler* held the statute unconstitutional under the First Amendment because the state did not establish either that it was necessary to further the state's interest in protecting minors or was narrowly tailored to achieve a compelling state interest. (*Engler* at pp. 751-752.)

In *Johnson,* the court examined a New Mexico statute (N.M. Stat. Ann. § 30-37-3.2, subd. A) that made criminal the use of computers to disseminate harmful matter to a minor. (*Johnson, supra,* 194 F.3d at p. 1152.) *Johnson* held the statute unconstitutional under the First Amendment because "the statute as written, like the CDA [in *Reno*], unconstitutionally burdens otherwise protected adult communication on the Internet." (*Johnson, supra,* at p. 1160.)

I am convinced section 288.2, subdivision (b) is facially overbroad because in the borderless world of the Internet, a sender engaged in speech protected in his domicile is subjected under section 288.2, subdivision (b) to criminal prosecution in California. First, in numerous states an 18-year-old man can seek sexual liaisons with females he knows to be 16 and 17 years old; there is presumably no bar against exchanging "indecent" matter with these consenting "adults" to induce that liaison, which matter may even be sent with the intent to seduce. (See, e.g., Ala. Code § 13A-6-110; Ind. Code Ann. § 35-42-4-6; N.M. Stat. Ann. § 30-37-3.2.) Although this speech is protected in those states, the speaker faces criminal liability in California if (1) he transmits the offending message in California, (2) the receiver remotely retrieves the message in California, or (3) if the offending message is electronically routed through a computer in California. Because an Internet correspondent's e-mail address is a logical rather than geographic construct, it is ordinarily impossible for the sender to know the physical location of his correspondent; the in terrorem effect of the California statute will chill the sender into self-censorship for fear that speech otherwise protected in his state might enter California and trigger criminal liability.[12]

A second factor—the variability among community standards—also leads me to conclude that section 288.2, subdivision (b) threatens to chill protected speech.[13] Because of the nature of the Internet, a sender could transmit matter protected in his domicile (because not deemed harmful under the

---

[12]The California statute also provides leverage for an opponent of speech protected in other jurisdictions to exercise a heckler's veto by logging on, informing the would-be speakers of the presence in the forum of a Californian under the age of 18, which could chill further communication among participants entitled to engage in the speech. (*Reno, supra,* 521 U.S. at p. 880 [117 S.Ct. at p. 2349].)

[13]The commentators have recognized the problems presented in applying the *Miller* community standard test to matter transmitted over the Internet. (See, e.g., Burke, *Cybersmut and*

community standards prevailing in his domicile), without knowing the recipient was downloading that matter in California and be subject to more stringent community standards for matter deemed inappropriate for minors.[14] Because of the nature of the Internet a sender, even though he knows the recipient is a minor and has the requisite intent and purpose required by section 288.2, subdivision (b), cannot know the geographic locale of the recipient and hence whether matter acceptable in the sender's domicile might qualify as harmful matter to that recipient. The sender must therefore self-censor for fear that speech otherwise protected in his or her state might enter California and trigger criminal liability.[15]

I conclude that section 288.2, subdivision (b) suffers from substantial facial overbreadth by criminalizing potentially protected speech. Even assuming the goals of the statute serve a substantial state interest,[16] the People make no effort to demonstrate that the state interest cannot be

---

the First Amendment: A Call for a New Obscenity Standard (Winter 1996) 9 Harv. J.L. & Tech. 87, 108-113 (Burke); Alexander, Jurisdiction and the Miller Obscenity Standard (Summer 1998) Seton Hall Const. L.J. 675, 677-680.)

[14]In at least one reported case, U.S. v. Thomas (6th Cir. 1996) 74 F.3d 701, the danger of conflicting community standards creating criminal liability for cyberspace activity became reality. In Thomas, a California couple while in California posted matter on their Web site not deemed obscene in California. (Burke, supra, 9 Harv. J.L. & Tech. at pp. 116-117.) However, that matter was downloaded in Tennessee and formed the basis for prosecuting the couple under Tennessee law because the matter was deemed obscene under Tennessee's more stringent standards. (Thomas, supra, at pp. 710-711.) Although the Thomas court concluded application of Tennessee's standards posed no danger of chilling speech protected under the First Amendment, the court's rejection of the First Amendment challenge turned on the fact that the defendants allowed a person they knew to be a Tennessee citizen to access to their matter in Tennessee. Because of this fact, reasoned Thomas, "[d]efendants' First Amendment issue . . . is not implicated . . . . This is not a situation where the bulletin board operator had no knowledge or control over the jurisdictions where materials were distributed for downloading or printing. . . . Defendants had in place methods to limit user access in jurisdictions where the risk of a finding of obscenity was greater than that in California. . . . If Defendants did not wish to subject themselves to liability in jurisdictions with less tolerant standards for determining obscenity, they could have refused [access to persons] in those districts, thus precluding the risk of liability." (Id. at p. 711.) Unlike application of the Tennessee statute in Thomas, section 288.2, subdivision (b) does not predicate criminal liability on the defendant's knowledge that the recipient is a California domiciliary to whom California's community standards will be applied.

[15]For example, the Pataki court noted that the Broadway play Angels in America, which concerned homosexuality and AIDS and received two Tony Awards and a Pulitzer prize, was acceptable in New York but condemned in North Carolina. (Pataki, supra, 969 F.Supp. at p. 182.) Reno echoed similar concerns that the variability of community standards could chill protected speech. (Reno, supra, 521 U.S. at p. 878 [117 S.Ct. at p. 2348].)

[16]Hatch points out that the legislative history cited very few concrete examples of Internet child stalking, with only a single example involving a California perpetrator. (See Sen. Com. on Pub. Safety, Analysis of Assem. Bill No. 181 (1997-1998 Reg. Sess.) as amended Apr. 18, 1997, par. 2.) A casual review of newspaper articles reporting Internet communications potentially violative of section 288.2, subdivision (b) shows there may be many perpetrators

advanced by less restrictive means (like receiver-based controls or filters as discussed in *Shea on Behalf of American Reporter v. Reno* (S.D.N.Y. 1996) 930 F.Supp. 916, 931-934, *American Civil Liberties Union v. Johnson* (D.N.M. 1998) 4 F.Supp.2d 1029, 1033, and *Reno, supra,* 521 U.S. at pp. 854-855 [117 S.Ct. at pp. 2336-2337]) that impose less onerous burdens on protected speech. (See *Denver Area Ed. Telecommunications Consortium, Inc. v. FCC* (1996) 518 U.S. 727, 753-760 [116 S.Ct. 2374, 2390-2394, 135 L.Ed.2d 888] [invalidating regulation as overbroad when recipient-based controls available] and *Engler, supra,* 55 F.Supp.2d 737 at pp. 750-751.) In my opinion, section 288.2, subdivision (b) is invalid under the First Amendment.

II

STATUTORY INTERPRETATION OF SECTION 288.2, SUBDIVISION (a)

The Commerce Clause and First Amendment infirmities of section 288.2, subdivision (b) arise because that subdivision explicitly applies to Internet communications. However, section 288.2, subdivision (a) does not expressly apply to Internet communications and the facial constitutional infirmities of subdivision (b) are not exposed by the express wording of subdivision (a). The issue is whether Hatch may nevertheless be prosecuted as charged under section 288.2, subdivision (a) for his pre-January 1, 1998, acts of distributing harmful matter over the Internet.[17]

The majority concludes the plain meaning of the text of section 288.2, subdivision (a), which proscribes distribution of harmful matter "by any means," permits prosecution of Hatch for his Internet communications because the Internet is a "means." By focusing only on subdivision (a), the majority opinion states "the question answers itself." Although statutory interpretation initially focuses on the text of a statute to construe its meaning (*People v. Valladoli* (1996) 13 Cal.4th 590, 597 [54 Cal.Rptr.2d 695, 918 P.2d 999]; *People v. Benson* (1998) 18 Cal.4th 24, 30 [74 Cal.Rptr.2d 294, 954 P.2d 557]), it must consider the internal context of the entire statute and consider it as a whole, construing its various parts to give meaning to each

---

but few victims. The "victims" appear overwhelmingly to be either adult investigative reporters, as in this case, or police officers. Except for sting operations, there may be very few crimes. When a statute imposes substantial burdens on First Amendment rights and produces minimal benefits, the courts have recognized that " 'the State may not regulate at all if it turns out that even the least restrictive means of regulation is still unreasonable when its limitations on freedom of speech are balanced against the benefits gained from those limitations.' " (*Carlin Communications, Inc. v. F.C.C.* (2d Cir. 1988) 837 F.2d 546, 555.)

[17]Section 288.2, subdivision (b) became effective on January 1, 1998, and section 288.2, subdivision (a) was the criminal statute potentially applicable to Hatch's 1997 Internet conduct. (Stats. 1997, ch. 590, § 1.)

part. (*Laureano v. Christensen* (1971) 18 Cal.App.3d 515, 521 [95 Cal.Rptr. 872].) Although the meaning of a statutory phrase may be plain and certain if the phrase is considered in isolation, blind adherence to the text of a statutory phrase is improper if its literal interpretation is inconsistent with other provisions of the same statute, defeats the apparent legislative intent and is otherwise in conflict with accepted interpretive canons. (*Leslie Salt Co. v. San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 614 [200 Cal.Rptr. 575].) Because section 288.2, subdivision (b) specifically includes Internet communications and section 288.2, subdivision (a) does not, it is unclear from the internal context of the statute whether section 288.2, subdivision (a) also includes Internet communications. Because the textual meaning of section 288.2, subdivision (a) is uncertain, I consider other aids of statutory construction, including legislative intent and accepted canons of statutory interpretation.

I conclude that the "any means" language of section 288.2, subdivision (a) does not include Internet distribution of harmful matter.[18] First, when the Legislature makes material changes to an existing statute by amendment, it is ordinarily presumed the Legislature intended to change the meaning of the existing law (*Dubins v. Regents of University of California* (1994) 25 Cal.App.4th 77, 85 [30 Cal.Rptr.2d 336]). There must be a clear demonstration, from either the nature of the amendment or an express legislative declaration, to conclude the Legislature intended only to clarify existing law (*Verreos v. City and County of San Francisco* (1976) 63 Cal.App.3d 86, 99 [133 Cal.Rptr. 649]). The 1997 amendment to section 288.2 adding subdivision (b) to specify that Internet distribution is a crime was not accompanied by any statement that it merely clarified or was declarative of existing

---

[18]Although I conclude section 288.2, subdivision (a) does not include Internet communications, there are additional reasons for concluding it would not cover those counts involving Hatch's 1998 Internet communications (counts 13 and 19). The Legislature enacted subdivision (b) to provide specific standards for criminal liability when the Internet is used to distribute the harmful matter to minors. A specific statute relating to a particular subject will govern over a more general statute even though the latter, standing alone, is sufficiently comprehensive to encompass the subject to which the more specific statute relates. (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 988 [44 Cal.Rptr.2d 93].) Moreover, provisions of a statute should be read together and the courts should, where possible, adopt a construction in which all parts are given meaning and no part is made useless or surplusage. (*People v. Hamilton* (1995) 40 Cal.App.4th 1137, 1144 [47 Cal.Rptr.2d 343].) Finally, when the Legislature has carefully employed a term in one statute but excluded it from a related statute, we should not imply the term into the statute from which it was excluded. (*Grubb & Ellis Co. v. Bello* (1993) 19 Cal.App.4th 231, 240 [23 Cal.Rptr.2d 281].) The People's argument that Hatch's 1998 conduct is subject to prosecution under subdivision (a) is inconsistent with each of these principles: it ignores that the Legislature by its enactment of subdivision (b) provided a more specific treatment of the subject; it makes subdivision (b) superfluous; and it requires that a term specifically included in subdivision (b) but excluded from subdivision (a) be judicially implied into subdivision (a).

law, and I therefore presume the addition of Internet distribution was to change the existing scope of section 288.2 by expanding it to cover a previously uncovered communications medium.[19]

Second, a statute should be constructed to preserve its constitutionality.[20] (*Erznoznik v. City of Jacksonville* (1975) 422 U.S. 205, 216 [95 S.Ct. 2268, 2276, 45 L.Ed.2d 125].) The majority's construction of section 288.2, subdivision (a) to include Internet distribution raises the constitutional infirmities of subdivision (b). Moreover, the majority's construction of subdivision (a) presents an additional First Amendment overbreadth concern. Under subdivision (a), a sender can be held criminally liable for distributing harmful matter to a minor without knowing the recipient was a minor if he "fails to exercise reasonable care in ascertaining the true age" of the recipient. The *Reno* court concluded that because the Internet precludes any effective method for a transmitter to verify the age of his recipients, even a requirement of actual knowledge of the recipient's age would not eliminate the chill on protected speech. (521 U.S. at pp. 876-877 [117 S.Ct. at p. 2347].) If a statute requiring actual knowledge of the recipient's age is nevertheless overbroad by "inevitably curtail[ing] a significant amount of adult communication on the Internet" (*ibid.*), the threat of criminal liability

---

[19]The legislative history accompanying the 1997 enactment sheds no light on whether the Legislature intended section 288.2, subdivision (b) to change rather than clarify existing law. Although one legislative report states the bill was a "clarification of existing law rather than an addition to it" (Sen. Com. on Pub. Safety, Analysis of Assem. Bill No. 181 (1997-1998 Reg. Sess.) as amended Apr. 18, 1997, par. 2), another legislative report states "the Internet is not specifically covered [by existing law]. This bill would expand the law to also prohibit the use of the Internet . . . to seduce a minor." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 181 (1997-1998 Reg. Sess.) as amended June 16, 1997, p. 1, at <http://www.leginfo.ca.gov> [as of Mar. 27, 2000].)

[20]When a court evaluates a facial challenge to a statute and the statute is readily susceptible to a narrowing construction that avoids constitutional infirmities, we should adopt that interpretation. (*Virginia v. American Booksellers Assn* (1988) 484 U.S. 383, 397 [108 S.Ct. 636, 645, 98 L.Ed.2d 782].) Section 288.2, subdivision (b) is not readily susceptible to a narrowing construction because its express application to the Internet triggers both commerce clause and First Amendment issues. However, section 288.2, subdivision (a)'s criminalization of the distribution of harmful matter by any means is susceptible to an interpretation that it does not apply to Internet communications and is limited to other forms of distribution. When non-Internet forms of distribution are involved, the constitutional infirmities infecting subdivision (a) appear to evaporate. For example, a person who uses personal delivery to distribute harmful matter to a minor within California engages in wholly intrastate activity not subject to commerce clause prohibitions on state regulation, and the defendant is not engaged in speech protected in the locus of his action. A person who distributes harmful matter from outside California but uses methods requiring him to know the recipient is in California (e.g., through use of the mails, telephones or fax machines) knowingly subjects himself to application of California's standards for determining age of minority and whether the matter is harmful under California standards (*U.S. v. Thomas, supra*, 74 F.3d 701, 711), thereby mooting the commerce clause concerns for multiple inconsistent burdens or extraterritorial projection of California law into other states, as well as mooting the claim he was engaged in protected speech. (*Ibid.*)

under the "should have known" standards of subdivision (a) imposes an even greater chill on protected speech because the sender could face criminal liability based on ad hoc decisions regarding whether he exercised reasonable care to determine the age of his correspondent.

Third, when the juxtaposition of statutory subdivisions creates uncertainty as to the reach of a criminal statute, settled principles caution that the uncertainty be resolved in favor of the defendant (*People v. Piper* (1986) 42 Cal.3d 471, 477 [229 Cal.Rptr. 125, 722 P.2d 899]); under the rule of lenity the defendant is entitled to the benefit of every reasonable doubt as to whether the statute is applicable to him. (*People v. Bryant* (1992) 10 Cal.App.4th 1584, 1599 [13 Cal.Rptr.2d 601].) The juxtaposition of section 288.2, subdivisions (a) and (b), coupled with the legislative history and the disparate standards of culpability between those subdivisions, lead me to construe section 288.2, subdivision (a) as inapplicable to Internet communications.[21]

## III

### CONCLUSION

I would issue a writ of mandate directing the superior court to vacate its November 18, 1998, order denying Hatch's motion to set aside the information, and to enter a new and different order granting Hatch's motion to set aside counts 2 through 19 of the information and denying Hatch's motion to set aside counts 1 and 20 through 23.

A petition for a rehearing was denied April 26, 2000, and the opinion was modified to read as printed above. McDonald, J., was of the opinion that the petition should be granted. Petitioner's petition for review by the Supreme Court was denied July 19, 2000.

---

[21]Hatch also argues that because section 288.2, subdivisions (a) and (b) define the requisite mens rea of the offenses as the intent or purpose of seducing the minor, and the term "seduce" is not sufficiently definite or specific to give notice of the proscribed intent, section 288.2 is invalid for vagueness under the due process clause of the Fifth Amendment. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1115-1116 [60 Cal.Rptr.2d 277, 929 P.2d 596]; *Pryor v. Municipal Court* (1979) 25 Cal.3d 238, 252 [158 Cal.Rptr. 330, 599 P.2d 636].) It is unnecessary for me to examine this contention because I have concluded that subdivision (b) is invalid for other reasons and subdivision (a) is inapplicable to Hatch's Internet conduct. However, it would appear incumbent on the majority to evaluate this argument.